# Exhibit A

to
Declaration of David E. Lyon
in Support of Motion for Stay
of Administrative Judgment
and for Relief from Bond
Requirement; Alternatively,
Motion to Set Amount of Bond

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
SPECIAL EDUCATION DIVISION
STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of: <br><br> STUDENT, <br><br>                    Petitioner, <br><br> v. <br><br> SAN RAFAEL CITY SCHOOLS, <br><br>                    Respondent. | OAH CASE NO. N2007050679 |

## DECISION

John A. Thawley, Administrative Law Judge (ALJ), Office of Administrative Hearings, Special Education Division (OAH), State of California, heard this matter on July 13, 16, 17, 19, 20, and 23, 2007, in San Rafael, California.

Margaret Broussard and Annie Cox, Attorneys at Law, represented Petitioner (Student). Student's Mother and Father also attended the hearing.

David Lyon and Renee Sanchez, Attorneys at Law, represented Respondent San Rafael City Schools (District).

Student's due process hearing request was filed on May 18, 2007. At the hearing, oral and documentary evidence were received. The record was held open for the submission of closing briefs, which were timely filed on August 3, 2007. The record closed and the matter was submitted on August 3, 2007.

## ISSUES[1]

I.     For the 2004-2005 school year (SY), did the District fail to assess Student in the areas of language arts and math facts?

---

[1] The issues and contentions have been refined and clarified based on the evidence adduced at the hearing.

II.     For the 2004-2005 school year, did the District deny student a free appropriate public education (FAPE) by:

    a.     Failing to include goals in the areas of spelling, writing, math, and reading?
    b.     Failing to provide sufficient Resource Specialist Program (RSP) services?
    c.     Failing to specify the delivery model for speech and language (SL) services?

III.    For the 2005-2006 school year, did the District deny student a free appropriate public education (FAPE) by:

    a.     Failing to convene a timely individualized education plan (IEP) team meeting?
    b.     Failing to have all required members of the IEP team present?
    c.     Failing to include goals in the areas of spelling, writing, and reading?
    d.     Failing to provide sufficient RSP services?
    e.     Failing to specify the delivery model for SL services?
    f.     Failing to offer Extended SY (ESY) services?

IV.    For the 2006-2007 school year, did the District deny student a free appropriate public education (FAPE) by:

    a.     Failing to provide parents with notice of their parental rights?
    b.     Failing to timely convene an IEP team meeting upon parental request?
    c.     Failing to include goals in the areas of spelling, writing, and reading?
    d.     Failing to ensure Student's GE teacher was aware of Student's IEP?

## PARTIES' CONTENTIONS

The time period at issue in this case begins on May 18, 2005, two years before the matter was filed.[2] Student does not allege that the two-year statute of limitations was tolled. As to this portion of the 2004-2005 SY, Student alleges that the District failed to assess him in the areas of Language Arts and Math Facts, which were clearly areas of suspected disability. He also alleges that the District denied him a FAPE by failing to offer an appropriate placement that would have allowed him to receive educational benefit because the March 18, 2005 IEP failed to include goals in the areas of spelling, writing, math and reading, because District would have had to have assessed Student to determine his unique academic needs before developing appropriate goals and objectives in those areas, and because the District's offer of two 30-minute RSP sessions was insufficient to meet his unique needs. Student also asserts that the March 18, 2005 IEP improperly failed to specify whether the SL services Student would be receiving were push-in or pull-out.

---

[2] District continues to assert that the two-year statute of limitations bars any claims flowing from the March 2005 IEP. However, District's motion in this regard was denied in a previous order. As a result, this matter deals with claims dating from May 18, 2005, two years before Student filed this matter.

As to the 2005-2006 SY, Student claims that the District failed to convene a properly-constituted IEP team meeting within the legal time limits, because the initial IEP team meeting on the IEP due date in February 2006 was convened without a primary assessor, and the follow-up IEP team meeting was not convened until about a month later. Student claims that the District denied him a FAPE by failing to offer an appropriate placement that would have allowed him to receive educational benefit because the February-March 2006 IEP failed to include goals in the areas of spelling, writing, and reading, and because the District's offer of four 30-minute RSP sessions was insufficient to meet his unique needs. Student also asserts that the February-March 2006 IEP improperly failed to specify whether the SL services Student would be receiving were push-in or pull-out. Student claims that he required ESY services, which the District failed to offer.

As to the 2006-2007 SY, Student alleges that the District failed to inform Student's parents that they needed to give a written notice of unilateral placement, and failed to convene an IEP team meeting when Student's parents requested one, prior to placing him at a non-public school. Student alleges that the District denied him a FAPE by failing to offer an appropriate placement that would have allowed him to receive educational benefit because the February-March 2006 IEP failed to include goals in the areas of spelling, writing, and reading. Student also asserts that the District failed to ensure that his general education (GE) teachers were aware of the contents of his IEP

District argues that: (1) Student's IEPs properly noted the delivery model of SLT; (2) the District drafted sufficient goals; (3) the District assessed Student in all areas of suspected disability; (4) the District properly began Student's annual IEP team meeting in February 2006, and then re-convened the IEP team meeting in March 2006, when everyone, including Student's tutor, was available; (5) the District's offers of placement for all three school years constituted a FAPE, including the RSP time provided to Student, from which Student received educational benefit, and made academic progress; (6) Student was offered ESY services; and (7) Student's 2006-2007 GE teacher was aware of Student's IEP.

## FACTUAL FINDINGS

*Background Facts*

1.    Student was born April 22, 1995, and lives with his parents and two older sisters within the District's boundaries. Both of Student's sisters received special education and related services from the District. As set forth below, on May 11, 2004, Student was found eligible for special education and related services due to a SL disorder. On March 8, 2005, he was also found eligible for special education and related services due to a specific learning disability (SLD) based on weaknesses in his auditory and visual sequential memory skills, as well as attention issues. He currently attends the Star Academy, a non-public school in San Anselmo, California.

2.      During the 2003-2004 SY, Student attended the District's Sun Valley Elementary School (Sun Valley). On March 10, 2004, Bobbi Nordstrom, Student's kindergarten teacher, referred him to a Student Study Team (SST), due to difficulties with following directions, memory, attention span, task completion, distractibility, fine/gross motor skills, and articulation. Ms. Nordstrom noted a number of symptoms, including speech problems, poor sound discrimination, difficulty with sound/symbol association, difficulty with lining up or spacing numbers neatly in math problems, reversals of letters like "b" and "d," and difficulty in beginning or completing tasks without structure.

3.      Mother consented to a speech assessment by the District. On May 10, 2004, a District SL pathologist (SLP) assessed Student. At an IEP team meeting on May 11, 2004, the IEP team found Student eligible for special education and related services due to a SL disorder. The District offered one 30-minute session of SL therapy per week. Mother signed her consent to the IEP. The IEP also indicates that Mother received a copy of the Procedural Safeguards, the IEP, and the evaluation report.

4.      Student's kindergarten report card indicates that, for the most part, he was consistently working at his ability level in effort, enrichment participation, personal/social growth, listening and speaking, and physical development. Student's Language Arts grades for the third trimester indicated that he was meeting or exceeding grade level expectations in 26 of 32 areas. He was working toward grade-level expectations in matching letters to short vowel sounds, using phonetically spelled words to write about experiences or a topic, and knowing his phone number. He was working below grade level expectations in naming some lower case letters, matching some lower case letters to their consonant sounds, and reading simple one-syllable and high frequency words. Student was meeting or exceeding grade-level expectations in all of the 22 areas of Math Achievement for the third trimester.

*The 2004-2005 School Year*

   *Assessment*

5.      As described in Legal Conclusion 8, a school district has an obligation to initiate a special education assessment referral of a student upon receiving a written request for such an assessment, or if the school district had a reason to suspect that the student had a disability and a reason to suspect that special education and related services may be needed to address that disability. A failure to assess may be a procedural violation of the IDEA. A procedural violation is a denial of FAPE if it impeded the pupil's right to a FAPE, significantly impeded the ability of the pupil's parents to participate in the decision-making process regarding the provision of a FAPE to the pupil, or caused a deprivation of educational benefits to the pupil.

   *Speech-Language*

6.      During the 2004-2005 SY, Student received SL services from the District pursuant to his IEP. Student does not dispute the services provided, the February 2005 SL

assessment, or the SL goals developed as a result of the SL assessment. Rather, as discussed below, Student's only SL claim is as to the specificity of the District's offer of SL services.

*Math*

7.    Student claims that the District failed to assess him in the area of Math Facts. District acknowledges this, but responds to Student's claim by asserting that there was no need to assess, because Math Facts was not an area of suspected disability. District supports its defense by noting Student's educational progress in Math Facts, as evidenced by Student's grades and the report card comments of Teryl Volkober, Student's first grade teacher.

8.    In Math Facts, Student's first grade report card for the third trimester indicates that he was meeting grade-level standards in 23 of the 29 areas, and he was working toward the grade-level standards in four areas: writing numbers to 100, knowing subtraction facts from 10, counting by two's to 100, and solving addition and subtraction problems with one- and two-digit numbers, two of which were not assessed until the third trimester. Student was having difficulty with knowing addition facts to 10, as well as knowing subtraction facts from 10 and committing them to memory, which was not assessed until the third trimester.

9.    District's defense is persuasive. Student's grades indicate that Student did quite well in Math Facts during the 2004-2005 SY, continuing the Math Facts success he achieved in kindergarten. He met grade-level standards in about 79 percent of the Math Facts areas (23 out of 29). As a result, Math Facts was not an area of suspected disability, and District had no reason to suspect that Student had a disability in the area of Math Facts. Therefore, District had no obligation to assess Student in Math Facts.

*Language Arts[3]*

10.    Student also claims that the District failed to assess him in the area of Language Arts. District again acknowledges this, but responds to Student's claim by asserting that Student made more than trivial educational progress in Language Arts, as evidenced by Student's grades and Ms. Volkober's comments.

11.    Meanwhile, on October 14, 2004, Ms. Volkober referred Student to a SST. The referral was based on many of the same reasons cited by Student's kindergarten teacher, including difficulties with following directions, memory, and attention span, due to symptoms such as possible poor sound discrimination, difficulty with sound/symbol association, difficulty with lining up or spacing numbers neatly in math problems, reversals of letters like "b" and "d," and difficulty in following instructions or grasping content despite repetitions/clarifications.

---

[3]  Some background and foundation information is provided here, to establish the history of Student's Language Arts difficulties.

12.     At the SST meeting on December 7, 2004, the SST members noted that Student's independence had decreased, he was anxious, and he was in the bottom quarter of his Language Arts class. Student had attended a Sonoma State University phonics program in the summer of 2003 (which Mother thought was too advanced), during the summer of 2004 he had had a tutor for six weeks and attended summer school (which Mother thought was inappropriate because of the high student-to-teacher ratio and because almost all of the pupils were English-language learners), he was receiving SL services for articulation, and Mother was using flash cards at home. The Assessment Planning Team (APT) members agreed to meet to consider whether additional SL or RSP assessments were needed, Mother agreed to look for worry beads, and Mother consented to Student seeing a counselor. The APT members decided that only a SL assessment was appropriate.

13.     In preparation for the IEP team meeting on March 8, 2005, Ms. Volkober completed a teacher report. Student was a very hard worker who had a great attitude and wanted to do well, but he was working below grade level. He needed to improve progress toward standards and classwork completed. Ms. Volkober was providing Student with a number of accommodations and modifications, including extended time for completing tests and assignments, shortened assignments, a peer buddy, giving directions in a variety of ways, and preferential seating. She did not indicate that the IEP team should consider any additional accommodations and modifications.

14.     The IEP team met on March 8, 2005. As set forth in the "Placement" section below, Mother consented to the additional services offered by District.

15.     On Student's first grade report card, Ms. Volkober indicated that Student exhibited mostly satisfactory effort, meaning that Student was usually working at his ability level, except for Writing, where Student received a grade of "Needs Improvement," not working to ability level, for all three trimesters of the school year. By the third trimester in Language Arts, Student met grade-level standards in 19 of the 33 areas, and he was working toward the grade-level standards in 12 areas, including reading common and irregular sight words, clearly retelling the beginning, middle, and ending of stories, using descriptive words when writing, and writing using phonetic sounds. However, six of the 12 areas where Student was working toward the standard were not assessed until the third trimester. Student was having difficulty with reading aloud with fluency and spelling high-frequency words from the grade-level list.

Ms. Volkober's comments reflect Student's grades. However, Ms. Volkober's third trimester comment reads, in part, "[Student] continues to improve in all subject areas, but struggles with language arts. He needs to continue to read and practice subtraction math facts during the summer. He has a great attitude toward learning and really tries his hardest to do well . . . ."

16.    District also presented the expert testimony of Claudia Wilson, Ph.D.[4]  Dr. Wilson established that there is a wide variety of reading levels among first grade pupils, starting with some pupils who have not yet learned to read.  Her testimony in this regard was corroborated by Michael Buckley, school psychologist, and Frances Dahlstrom, the RSP teacher.  Ms. Dahlstrom testified that she often does not like to do assessments on young pupils like Student, who are often found ineligible because the wide skill range in first grade makes it difficult to get assessment scores that indicate a learning disability.  Ms. Dahlstrom also testified that Student was slightly developmentally immature.  According to Ms. Dahlstrom, the thinking as to Student was that, since he was already receiving special education and related services, the District could provide him with additional services and assess him later, to give the IEP team more information.

17.    However, District's defense is unpersuasive.  Dr. Wilson acknowledged that: (1) "everybody agrees that [Student] had difficulty in Language Arts, decoding, fluency, spelling, blending, and all of those things . . ."; (2) Student's progress in Language Arts was "slow"; (3) it was possible that Student required more intervention; and (4) to remediate reading problems, it is "always important, whenever possible, to intervene as early as you can."

18.    By May 18, 2005, the date to which this decision is permitted to look due to the two-year statute of limitations, the District had reason to suspect that Student had a disability in the area of Language Arts, and that special education and related services may be needed to address that disability.  First, Student had twice been referred to SSTs for Language Arts problems.  Moreover, as noted by Craig Garabedian,[5] Student's expert witness, the concerns raised in the second referral of Student to a SST should have been addressed by an IEP team, given that Student was already receiving special education and related services, that Student had a family history of learning disabilities, and that Student was receiving SL services for articulation.  Mr. Garabedian and Ms. Dahlstrom established that there is a link between articulation and reading problems.  Second, District acknowledged the seriousness of Student's Language Arts problems in March 2005 by offering and providing RSP services, albeit without any assessment to clarify the exact nature and source(s) of his problems.  Third, as evidenced by Student's third trimester Language Arts grades and Ms. Volkober's third trimester comments, Student continued to "struggle"

---

[4] In 1973, Dr. Wilson earned a bachelor's degree in linguistics, which includes the use of language in life.  In 1982, Dr. Wilson earned a master's degree in English, with an emphasis in teaching English as a second language.  She has been a San Francisco State University English Department faculty member since 1984, and she began teaching in the Special Education Department there in 1996.  In 1999, she earned a doctorate of philosophy degree in education, with an emphasis in special education – mild to moderate disabilities, which included coursework in how to teach reading.

[5] Mr. Garabedian is a licensed educational psychologist and a Diplomate with the American Board of School Neuropsychology.  After completing his master's degree in school psychology in 1994, he earned a Pupil and Personnel Services credential, and completed a two-year post-graduate program at the Fielding Institute to earn a certificate of specialization in clinical neuropsychology.  He has worked as a school psychologist since 1993, has been a guest lecturer at several universities, and has done a number of presentations and training seminars.

with Language Arts, even after the District had been providing RSP services for the three months between the March 2005 IEP and the end of the 2004-2005 SY. Dr. Wilson's testimony regarding Student's "slow" progress corroborates this finding. Furthermore, this finding is also supported by the June 2005 benchmark progress notes, all of which indicate that Student made only transitional or partial progress (defined as between one percent and 49 percent) and that more time was needed. Fourth, as established by Dr. Wilson and Mr. Garabedian, early intervention is "always" important. As a result, District failed in its duty to assess Student in the suspected disability of Language Arts.

### Student's Unique Needs for the 2004-2005 SY

19.     As described in Legal Conclusions 1 through 7 and 11, a school district provides a FAPE to a disabled pupil if its program or placement was designed to address the pupil's unique educational needs, was reasonably calculated to provide some educational benefit in the least restrictive environment, and if the services provided comport with the IEP. An IEP is reviewed in terms of what was, or was not, objectively reasonable at the time it was drafted.

#### Math

20.     As noted in Factual Findings 8 and 9, Math Facts was not an area of suspected disability; District had no reason to suspect that Student had a disability in the area of Math Facts; and, as a result, District had no duty to assess him in the area of Math Facts. Therefore, Student did not have unique needs in the area of Math Facts.

### Reading, Writing, and Spelling (Language Arts)

21.     As to Student's unique needs in the area of Language Arts, Student's third trimester grades indicated areas of concern in reading aloud with fluency and spelling high-frequency words from the grade-level list. Student had also not yet met grade-level standards in reading common and irregular sight words, clearly retelling the beginning, middle, and ending of stories, using descriptive words when writing, and writing using phonetic sounds. Student had also worked below his ability level in writing for all three trimesters of the school year. The testimony of Dr. Wilson corroborated Student's unique needs in the areas of fluency, blending, decoding, and spelling. At the March 2005 IEP team meeting, Mother and Ms. Volkober expressed concern about Student's problems in these areas, including sight word recognition. Ms. Dahlstrom did not know exactly how many sight words Student knew at that time, but it was "very few." Given that the District failed to assess Student in the area of Language Arts, further specificity is not possible.

### Goals for the 2004-2005 SY

22.     As described in Legal Conclusion 11, IEP goals must be measurable, must be designed to meet the pupil's unique needs, which result from the pupil's disability, to enable

the pupil to be involved in and make progress in the general curriculum, and must be designed to meet each of the pupil's other educational needs that result from the pupil's disability.

23.     As noted in Factual Finding 20, Student did not have unique needs in the area of Math Facts. Therefore, Student did not require goals in the area of Math Facts.

24.     However, as noted in Factual Findings 10 through 18, District failed to assess Student in the area of Language Arts. As noted in Factual Finding 21, Student had unique needs in the Language Arts areas of writing, spelling, and reading, specifically, in the areas of sight words, fluency, blending, and decoding.

25.     The March 8, 2005 IEP included one goal to address Language Arts difficulties – in the area of reading fluency.[6]  Student's goal was to be able to read beginning second grade text fluently at a rate of 40 correct words per minute on two out of three trials. The sight word objective was for Student to be able to read 100 sight words from a high-frequency list with 80 percent accuracy on two out of three trials. When given appropriate texts, Student was to be able to blend sounds into words, to demonstrate sounds made by letter combinations such as "sh" and "th," and to be able to read basic compound words. The goal was appropriately measurable.

26.     However, the IEP did not include goals in the areas of writing or spelling. As noted in Factual Finding 21, these were areas of unique need for Student. As a result, District denied Student's right to a FAPE in the Language Arts areas of writing and spelling, by failing to develop goals to meet Student's unique needs in these areas.

*RSP for the 2004-2005 SY*

27.     At the IEP team meeting on March 8, 2005, Mother expressed her concerns that Student was having difficulty keeping up with the class in Language Arts, that he was struggling with decoding, and that he was aware of his difficulties and showing frustration. The District's offer doubled the amount of SL therapy that Student was to receive – to two 30-minute sessions per week. The District also offered two 30-minute RSP sessions per week, to address Student's decoding and frustration issues, and to help him keep up with his class in Language Arts. Mother signed her consent to the IEP. The IEP also indicates that Mother received a copy of the Procedural Safeguards, the IEP, and the evaluation report.

---

[6] It is interesting to note that the March 8, 2005 IEP did not include the Language Art goal when it was signed by Mother. It is undisputed that, as noted on the IEP comments page, the RSP goals were to be developed and sent to Student's home by March 18, 2005. However, Mother did not recall ever seeing the goals that were to be sent home. Nevertheless, such a process – of offering services in an IEP, and having a parent sign the IEP, all without having developed goals – would appear to stand the IEP process on its head, since unique needs determine goals, and goals determine services/placement. However, these events occurred outside the statute of limitations.

28. Student claims that the District violated his right to a FAPE by failing to provide sufficient RSP time. Mr. Garabedian noted that research shows that the majority of reading programs are effective, but that any reading program must be implemented as designed. Otherwise, there is no scientific evidence that a program will be effective. According to research, reading programs must be implemented for two hours per day for at least eight weeks, or for 40 minutes per day for an entire school year, to accurately judge progress. If a pupil failed to make progress in such a program, then the pupil should be switched to a different program.

29. The District defends against Student's claim by asserting that Student made educational progress. District's defense is based on Student's grades, Ms. Volkober's third trimester comments, and the testimony of Dr. Wilson, Ms. Dahlstrom, and Ms. Volkober that Student made slow but meaningful progress.

30. However, District's defense is unpersuasive. As noted in Factual Finding 15, Student's first grade report card grades for the third trimester, as well as Ms. Volkober's third trimester comments, reflect the minimal progress made by Student during the school year, and the continuing seriousness of Student's Language Arts problems. Student's minimal progress is corroborated by his June 2005 benchmark progress notes, which indicate that he made only transitional or partial progress, and that more time was needed. Moreover, a review of the present levels of performance from Student's March 2006 IEP sharply demonstrates the inadequacy of two 30-minute RSP sessions per week. The March 2005 IEP set an annual goal for Student to read 40 words per minute from a second grade text for two out of three times. However, Student was reading only 15 words per minute in March 2006. The March 2005 set an annual goal for Student to read 100 sight words from a high-frequency list with 80 percent accuracy for two out of three times. However, Student was only reading 50 sight words from a high-frequency list with 90 percent accuracy. Student's ongoing Language Arts problems required more than two 30-minute RSP sessions, particularly when the IEP team had no formal assessment information to assist them in determining the appropriate frequency and duration of the RSP sessions to offer to Student. Moreover, the seriousness of Student's Language Arts problems is further demonstrated by the fact that Student made only "slow" progress even though Mother took him to a tutor's office, to work on reading, writing, memorization, and phonics, two times per week during the 2004-2005 SY. District violated Student's right to a FAPE by failing to provide sufficient RSP services to meet Student's unique needs in the area of Language Arts.

*Specificity of the District's Offer for SL Services*

31. A school district is required to make a formal, specific written offer which clearly identifies the proposed placement and services. A procedural violation is a denial of FAPE if it impeded the pupil's right to a FAPE, significantly impeded the ability of the pupil's parents to participate in the decision-making process regarding the provision of a FAPE to the pupil, or caused a deprivation of educational benefits to the pupil.

32.    Student claims that the IEP was vague as to the location and character of the SL services. Student claims that the resulting lack of clarity substantially interfered with his parents' rights to participate in the formation of the IEP.

33.    As noted above, based on the boxes checked and the information filled in on page 16 of the March 8, 2005 IEP, the District offered two 30-minute sessions of SL therapy per week, both in Student's GE classroom, and in a room other than Student's GE classroom. On page 17, the IEP indicates that some services should be provided outside Student's GE classroom, and that Student would be removed from the GE classroom for six percent of his school time because "[s]mall group instruction is necessary for this student to acquire [the] skills specified in the IEP." Mother signed her consent to the IEP.

34.    The information on pages 16 and 17 is unclear as to where the SL services are to be provided. The boxes for the locations of the services, Student's GE classroom and another room, were supposed to be "or" options, not "and" options.

35.    In addition, on page 17, neither the "Direct" nor the "Consult" box is checked. Therefore, as acknowledged by Ms. Klibowitz, the District's offer is unclear as to how much of the two 30-minute sessions of SL therapy each week would be spent providing direct SL therapy to Student, and how much would be spent in consultation. As a result of the confusing nature of the IEP's location and direct-consult information, District failed to provide a clear offer of the SL services to be provided to Student.

36.    At the hearing, Mother attempted to establish that the lack of specificity had resulted in a denial of FAPE, in that she was unable to understand the District's offer. Mother emphatically testified that she simply signed the papers that District personnel on the IEP team handed to her, in order to get Student whatever help the District offered, and that she was an "isolated mother" who did not know what to do, in part because she did not feel like there was anyone she could turn to for assistance.

37.    There is no dispute that Mother cares deeply about and is devoted to the educational progress of her children. However, Mother undermined her own credibility because she sought to simultaneously portray herself in two very different and conflicting ways. As noted above, part of Mother's testimony portrayed her as a desperate parent, with no one to help her, who did not understand very much, signed any documents the District gave her, and would do anything to get help for her children. For example, at one point Mother testified that she was "grasping at straws" to try to help Student. However, at other times, Mother portrayed herself as a zealous parent who attended every IEP team meeting, volunteered at Sun Valley while working as a nurse, frequently talked to District personnel regarding her concerns about Student, and researched tutors and school placements for hours at a time. As Mother conceded, she was an experienced IEP team member, she believed the District's SL services helped Student, and she did not have SL concerns as to Student.

38.    As a result, this specificity violation did not prevent Student's parents from meaningfully participating in the IEP process, nor did it result in the loss of an educational

11

opportunity to Student. As noted above, Student does not dispute the SL assessment, the SL goals, or the services provided. Nor would there have been a basis for such challenges, considering the statute of limitations, given that the effectiveness of Ms. Klibowitz's SL services to Student was demonstrated by Student's achievement of two of his four goals within six months, from the May 2004 IEP to the November 2004 benchmark progress notes. Accordingly, District's procedural violation was harmless.

*The 2005-2006 School Year*

   *The Timing of the IEP team meeting, and the Composition of the IEP Team*

   39.   Once a school district has received a parent's consent to the district's proposed assessment plan, the school district may immediately begin the assessment. Thereafter, a school district must develop an IEP, required as a result of an assessment, no later than 60 calendar days, not counting school holidays of longer than five school days, from the date of receipt of the parent's written consent to assessment, unless the parent agrees in writing to an extension.

   40.   The required members of the IEP team are the parents of the disabled pupil, at least one of the pupil's GE teachers (if the pupil is or may be participating in the GE environment), at least one special education teacher or provider who provides special education to the pupil, a school district representative, an individual who can interpret the instructional implications of the assessments, other individuals who have knowledge or special expertise regarding the pupil (depending on the discretion of the parents or school district), and, whenever appropriate, the disabled pupil.

   41.   In September 2005, the District issued a notice to Student's parents and Michelle Giraud, Student's GE second grade teacher, that Student's IEP team meeting would be held on March 7, 2006.

   42.   During the Fall 2005, Ms. Dahlstrom and occasionally Ms. Klibowitz exchanged telephone calls and messages with Mother regarding Mother's concerns about Student.[7] On November 9, 2005, Mother wrote a note to Ms. Dahlstrom to request that Student be assessed in a variety of areas, including psychological and academic skills testing.

   43.   On November 18, 2005, the APT met and developed an assessment plan to determine if Student had a learning disability. The same day, the District sent the assessment plan to Student's parents.

   44.   On November 29, 2005, Mother signed her consent to the assessment plan, and indicated that she had received a copy of her rights. Mother also wrote a note to Ms.

---

   [7] For example, on October 10, 2005, Ms. Dahlstrom fulfilled a previous agreement to call Mother to check in. Student was not making "much progress." They talked about finding high-interest books at the library that Student could read at home, and about "[k]eeping [the] pressure off at home" so that Student did not "burn out." Ms. Dahlstrom asked Mother to call her anytime with questions.

Dahlstrom, requesting that Student's assessment include the Woodcock Johnson, Third Edition (WJ-III), as well as tests for receptive and expressive language. Between December 2 and 9, 2005, Ms. Dahlstrom, Ms. Klibowitz, and Mother exchanged phone calls and messages, which resulted in an agreement to use the WJ-III, Revised.

45.     In January and February 2006, Student was assessed, as discussed below in the "Unique Needs" portion of this decision. The IEP team meeting was scheduled for February 7, 2006.

46.     On February 6, 2006, as reflected in the District's Log of Important Contacts, Ms. Dahlstrom called Mother to review her report, and to tell Mother that she had jury duty and might not be available for the IEP team meeting the following day. Mother said that she would like to have the IEP team meeting rescheduled, so that Student's tutor could attend and could meet Ms. Dahlstrom.

47.     On February 7, 2006, the IEP team meeting convened and briefly reviewed some of Student's assessment results. However, no special education teacher was present. Ms. Dahlstrom was on jury duty, and so she was available by phone, at best. The IEP team agreed to continue the meeting. The second and final IEP team meeting occurred on March 7, 2006.

48.     District was required to hold an IEP team meeting and produce an IEP for Student by February 7, 2006, which was 60 days after Mother signed the assessment plan on November 29, 2005, not counting the 10-school-day break at the end of 2005. District failed to do so.

49.     District was also required to have a special education teacher or provider at the IEP team meeting. Since this IEP team meeting was the setting for the team's consideration of Student's additional eligibility due to a specific learning disability, and for the team's consideration of increasing the level of RSP services provided to Student due to his specific learning disability. Therefore, Ms. Dahlstrom's presence as Student's RSP provider was, as she acknowledged during her testimony, "critical" for the IEP team meeting. District failed to convene a properly-constituted IEP team.

50.     However, these violations did not prevent Student's parents from meaningfully participating in the IEP process, nor did they result in the loss of an educational benefit to Student. On February 10, 2006, Ms. Dahlstrom called Mother and received her permission to double Student's RSP services – by adding two 30-minute sessions of RSP support per week, as was proposed in the draft IEP. Accordingly, District's procedural violations of failing to convene a timely and properly-constituted IEP team meeting were harmless.

*Student's Unique Needs for the 2005-2006 SY*

51.     On February 2, 2006, Ms. Klibowitz completed an annual review survey. Student had met both of his "l" sounds goals, as well as one of his "r" sound goals. Ms.

Klibowitz recommended that Student continue to receive articulation therapy, in part to continue to work on his remaining "r" sound goal.

52.     On February 2, 2006, Mr. Buckley, school psychologist, completed his report. Mr. Buckley had administered the Wechsler Intelligence Scale for Children, Fourth Edition (WISC-IV), and the Bender-Gestalt Visual-Motor Test (Bender-Gestalt). Of the WISC-IV sub-test scores reported by Mr. Buckley, Student's lowest scores were in Picture Concepts portion of the Perceptual Reasoning Index (score of seven, 16th percentile), the Similarities portion of the Verbal Comprehension Index (eight, 25th percentile), and the Symbol Search portion of the Processing Speed Index (10, 50th percentile). Mr. Buckley noted that Student's overall cognitive score was one point below a high-average ranking. On the Bender-Gestalt, Student received a score of four, which placed him in the 60th percentile as to age. Mr. Buckley concluded that Student's achievement of re-drawing five of the nine designs in an orderly arrangement in less than four minutes, while the average time is about five to 10 minutes, demonstrated average visual-motor skills and an average level of short-term memory for drawn designs. However, Mr. Buckley noted that Student superimposed one design over another, which was an "unusual occurrence." Mr. Buckley concluded that Student simply lost perspective because he became so engrossed in drawing the designs. Mr. Buckley's overall conclusion was that Student demonstrated no indications of a profile consistent with a learning disability diagnosis.

53.     On February 7, 2006, Ms. Dahlstrom completed her report. Student's score on a recent AIMS Oral Fluency test was "Far Below Basic" in reading fluency. Ms. Giraud told Ms. Dahlstrom that Student was working far below grade level in Language Arts.

On the Kaufman Test of Educational Achievement, Student scored an 80, which is in the 9th percentile. On the Phonological Awareness Test (PAT), Student scored a 0 on the vowel diagraphs and diphthongs sub-tests, because he was unable to read any of them. His overall PAT score was 95, the 35th percentile. On the Test of Visual-Perceptual Skills, Student's overall score was in the average range, but he scored in the low or low average range on the Visual-Spatial Relationships and the Visual Figure-Ground sub-tests. On the Test of Auditory-Perceptual Skills, Revised (TAPS-R), Student's overall score was in the high average range, but he scored in the 25th percentile on the Number Memory Forward and on the Auditory Word Memory sub-tests. On the Developmental Test of Visual-Motor Integration (VMI), Student scored an 81, 10th percentile, on VMI, an 85, 16th percentile, on Motor, and a 102, 55th percentile, on Visual. Student scored "well below average" on the Jordon Left-Right Reversal Test.

On the WJ-III, Student scored in the low average range for reading skills. However, Ms. Dahlstrom noted that he had a "very difficult time" blending sounds to read words, that his decoding was "laborious," that he reversed letters, and that he frequently substituted or deleted sounds within words. Student scored in the 11th percentile in reading comprehension, and Ms. Dahlstrom confirmed this result when Student scored in the 9th percentile on a second reading comprehension test. Student scored in the low average range on the Writing Fluency portion of the Written Expression composite. Student was not

14

graded on spelling, and lost credit for several responses because his sentences were incomplete. On the Writing Sample sub-test, Student scored well within the average range, without considering spelling or reading. Ms. Dahlstrom noted that Student's spelling was poor on both sub-tests, that he did not demonstrate a "solid grasp of short vowel sounds or many common word patterns," and that some of his misspellings made phonetic sense, such as "uv" for "of," while others did not, such as "cen" for "king."

Ms. Dahlstrom concluded that Student's achievement was not commensurate with his age. She recommended that the IEP team discuss how to best meet Student's needs, including continued RSP services.

54.     On Student's second grade report card, Ms. Giraud indicated that Student's effort was excellent, that he consistently worked at his ability level, in all areas for all three trimesters. Student received satisfactory or excellent grades in all 13 areas of personal and social growth for the entire school year, except for two grades of "needs improvement" during the first trimester. In Math, Science, and Social Studies, Student met or exceeded grade level standards for all three trimesters.

However, Student was below grade level expectations for all three trimesters in Reading, Writing, and Spelling. For the third trimester, Student met or exceeded grade level standards in 15 of the 21 areas of Language Arts. He was working toward grade level standards in applying knowledge of basic syllabication rules when reading, creating readable documents with legible handwriting (for all three trimesters), capitalizing all proper nouns, words at the beginning of sentences and greetings, etc. (for all three trimesters), and spelling frequently used, irregular words correctly (for all three trimesters). He was below grade level standards in recognizing and using knowledge of spelling patterns (for both of the trimesters that this standard was assessed), and spelling basic short-vowel, long-vowel, r-controlled, and consonant blend patterns correctly (for all three trimesters).

Ms. Giraud's comments reflect Student's grades – that he had made progress in Language Arts, but that he remained below grade level. Ms. Giraud's second trimester notes indicate that Student continued to "struggle" with reading. For the third trimester, Student's phonetic spelling and recognition of sight words had improved, and Ms. Giraud recommended that Student work during the summer on reading, writing, and spelling.

55.     As revealed in the testing of Student by Mr. Buckley and Ms. Dahlstrom, as well as Student's grades and Ms. Giraud's comments, Student had unique needs in the Language Arts areas of writing, spelling, and reading, specifically, in the areas of decoding, blending, fluency, and sight words.

*Goals for the 2005-2006 SY*

56.     The February-March 2006 IEP contained two goals for Student's SL services, one each for the "l" and the "r" sounds. Student does not dispute those goals.

15

57.     Student claims that the District violated his right to a FAPE by failing to include goals in the areas of spelling, writing, and reading. As noted in Factual Findings 52 through 55, Student had unique needs in the Language Arts areas of writing, spelling, and reading, specifically, in the areas of decoding, blending, fluency, and sight words.

58.     The February-March 2006 IEP included three goals to address Student's Language Arts difficulties. The reading fluency goal indicated that Student was currently reading 15 correct words per minute, and that he would read 80 words per minute on two out of three trials with third grade reading text. The reading comprehension goal indicated that Student decoded most words on a sound-by-sound basis, and that he had difficulty accurately blending those sounds into words, which resulted in a lower-than-expected reading comprehension level, given his cognitive ability. Student was to improve his blending abilities to be able to, when given third grade text and five related questions, answer questions with 80 percent accuracy on three out of four trials. The sight word goal indicated that Student was currently reading the first 50 sight words from a high-frequency list with 90 percent accuracy. Student was to improve to the first 200 sight words from a high-frequency word list with 80 percent accuracy on two out of three trials. The goals were appropriately measurable, and were designed to address Student's unique needs in the areas of reading, decoding, blending, fluency, and sight words.

59.     However, the IEP did not include goals in the areas of writing or spelling. As noted in Factual Finding 54, Student's grades, Ms. Giraud's comments, and the District's assessments clearly identified these areas of unique need for Student. As a result, District denied Student's right to a FAPE in the Language Arts areas of writing and spelling, by failing to develop goals to meet Student's unique needs in these areas.

*RSP for the 2005-2006 SY*

60.     At the IEP team meeting on March 7, 2006, Mother expressed her concern that Student get the help he needed. The team meeting notes indicate that, following Mr. Buckley's presentation of his assessment, the IEP team concluded that Student also qualified for special education and related services based on a specific learning disability, because he had strong cognitive ability with weaknesses in visual processing areas.[8] The IEP team also discussed the RSP goals and strategies, and agreed to refer Student to on-site counseling. Joy Ruppersburg,[9] Student's private tutor, reviewed the services that she had been providing

---

[8] It is interesting to remember that Mr. Buckley's conclusion was that Student did not display any indication of a specific learning disability. Yet the IEP team reached exactly the opposite conclusion following the review of Mr. Buckley's assessment. The IEP team's finding corroborates Mr. Garabedian's opinion that Mr. Buckley's assessment was "remarkably cursory." Mr. Garabedian would have assessed in the areas of attention, phonics, rapid-naming, abstract language (unless the SLP was assessing that area), and fine motor coordination.

[9] Ms. Ruppersburg earned a bachelor's degree in education in 1975, and a master's degree in special education in 1984. She has over 25 years of experience in teaching and educational administration. She became a private educational therapist in about 2002, and committed to that practice full time in about June 2004.

16

to Student, and agreed to communicate with Ms. Dahlstrom regarding strategies and Student's progress.

The IEP team also found that Student remained eligible for special education and related services due to a speech and language disorder. The District's offer doubled the amount of RSP services that Student was to receive – to four 30-minute sessions per week. The District also offered one 30-minute SL session per week. Mother signed her consent to the IEP. The IEP also indicates that Mother received a copy of the Procedural Safeguards, the IEP, and the evaluation reports.

61.     Student claims that the District violated his right to a FAPE by failing to provide sufficient RSP time. As noted in Factual Finding 28, a reading program must be implemented as designed in order to be effective, which Mr. Garabedian recommended as two hours per day for eight weeks, or 40 minutes per day for an entire school year.

62.     The District defends against Student's claim by asserting that Student made educational progress. District's defense is based on Student's grades, Ms. Giraud's third trimester comments, and the testimony of Dr. Wilson, Ms. Dahlstrom, and Ms. Giraud that Student made meaningful progress.

63.     District's defense is persuasive. Student's second grade report card grades, as well as Ms. Giraud's third trimester comments, reflect Student's progress. Student's progress is corroborated his June 2006 benchmark progress notes, which indicate that Student made partial progress, to reading 27 words per minute in a second grade text, "Below Basic" in a third grade text, and 88 percent of 75 sight words. Additional RSP support would be ideal, given Student's slow progress from March to June 2006. However, District provided Student with a FAPE, beginning in March 2006, by providing sufficient RSP services to meet Student's unique needs, that was reasonably calculated to provide some educational benefit, in the area of Language Arts.

64.     Nevertheless, as noted in Factual Findings 27 through 30, two 30-minute sessions of RSP support was insufficient. Therefore, for most of the 2005-2006 SY, until the District increased Student's RSP support in March 2006; District failed to provide Student with sufficient RSP support. Also, Ms. Giraud acknowledged, it is impossible to know how much of Student's progress came from Student's RSP support combined with Ms. Giraud's GE classroom efforts (Ms. Giraud was a former RSP teacher), as opposed to the tutoring services Student was receiving from Ms. Ruppersburg.

Ms. Ruppersburg began tutoring Student in November 2005, one 50-minute session per week. At the time, she had a waiting list of potential clients, so she could only offer one session per week. She began with an early-level Wilson reading program, but moved to a more advanced Wilson reading program after four sessions. She also used the "Earobics" program, and computer keyboarding, as learning tools that also served as behavioral award programs. Ms. Ruppersburg saw Student a total of nine times in November and December 2005. From January to March 7, 2006, when the District began providing Student with a

FAPE, Ms. Ruppersburg tutored Student two times a week for 50 minutes each, a total of 14 sessions. Ms. Ruppersburg reduced her rates for Student, to $80 per 50-minute session. Student's parents also paid Ms. Ruppersburg $200 for her assistance/attendance for the March 2006 IEP team meeting. As a result, District will be ordered to pay Student's parents $2040, the total for Ms. Ruppersburg's services for the 2005-2006 SY up until the time that the District began providing sufficient RSP services to Student.

*Specificity of the District's Offer*

65.     Student claims that the IEP was vague as to the location and character of the SL services. Student claims that the resulting lack of clarity substantially interfered with his parents' rights to participate in the formation of the IEP.

66.     Based on the information filled in on page 15 of the February-March 2006 IEP, the District offered one 30-minute sessions of SL therapy per week, in the Speech Room. The boxes checked in page 15 indicate that the "Direct" SL services will be provided both in Student's GE classroom, and in a room other than Student's GE classroom. On page 14, the IEP indicates that some services should be provided outside Student's GE classroom, and that Student would be removed from the GE classroom for eight percent of his school time because "[s]mall group instruction is necessary for this student to acquire [the] skills specified in the IEP." Mother signed her consent to the IEP.

67.     The information on pages 14 and 15 provides a confusing picture. The District offered direct SL therapy in the Speech Room, yet the boxes are checked to indicate that some services will occur both in Student's GE classroom, and in another room. Student was to be removed from his GE classroom for eight percent of his school day in order to receive small group instruction, including RSP support.

68.     Ms. Klibowitz explained that both the GE classroom and another room were checked because she sometimes visited Student's classroom to observe Student. When Ms. Klibowitz visited classrooms, she checked to see if she could provide the teacher with additional support. Consult services are not regularly noted on IEPs, but Ms. Klibowitz checks with teachers regarding their concerns, or the focus of goals. However, the District's lack of clarity as to the location of SL services resulted in a procedural denial of FAPE to Student.

69.     Nevertheless, for the same reasons noted in Factual Finding 38, the District's specificity violation did not prevent Student's parents from meaningfully participating in the IEP process, nor did it result in the loss of an educational opportunity to Student. Student does not dispute the SL assessment, the SL goals, or the services provided. The violation was harmless.

*Extended School Year Services*

18

70.    A school district must provide services, beyond the regular academic year, to a disabled pupil, whose disability is prolonged or may continue indefinitely, when the interruption of the pupil's academic program may cause regression, coupled with the pupil's limited recoupment abilities, would render it unlikely or impossible for the pupil to attain the level of self-sufficiency or independence that would normally be expected.

71.    The February-March 2006 IEP indicates that Student does not require special education and related services beyond the regular school year.

72.    However, as noted by Ms. Ruppersburg, Student needed remediation in reading, writing, and spelling. Without continuous review and work, Student very likely would regress, and his ability to recoup is not as good as other pupils. Ms. Ruppersburg provided reading instruction and remediation to Student for during June and July 2006. She testified that she saw Student 10 times during these two months, but documentation she provided to Mother only shows nine sessions. However, seven of the nine sessions were 1.5 hours each.

73.    Student required ESY services for Summer 2006. District had only been providing a FAPE to Student, in the way of RSP services, for about three months, during which time Student had demonstrated initial progress. Given the Student's ongoing learning disability, his need for remediation, and the likelihood that the failure to provide ESY services to Student would result in regression, the District was required to provide ESY services. As a result, District violated Student's right to a FAPE by failing to offer ESY services.

74.    Ms. Ruppersburg's documentation to Student's parents indicates that she billed them $700 for seven 1.5 hour sessions during June and July 2006. District will be required to reimburse Student's parents in this amount.

*The 2006-2007 School Year*

*Notice of Parents' Rights*

75.    A school district must provide parents with a copy of the procedural safeguards at least once a year, as well as upon the initial referral or parent request for assessment, the first occurrence of filing a request for due process hearing, or parent request. The procedural safeguards must include a full explanation, in an easily understandable matter, of the procedural safeguards including, among other things, the requirements for unilateral placement by parents of pupils in private or non-public schools at public expense.

76.    The District uses a document from the Marin Special Education Local Plan Area entitled "Notice of Procedural Safeguards and Parents' Rights." The March 2006 version contains a section entitled, "Children Attending Private School," that discusses, among other things, the requirements for parents to unilaterally place a pupil in a nonpublic

or private school. The section states, "You may also be denied reimbursement if you did not inform the school district that you were rejecting the special education placement proposed by the school district and did not give notice of your concerns and intent to enroll your child in a private school at public expense." The section continues, "You must notify the district of your intent to place your child in a private school . . . . In writing to the school district at least ten business days (including holidays) before removing your child from the public school. [Citation omitted.]" The form included contact information for District and the SELPA.

77.    Mother was an experienced participant in the District's special education process. Her daughter, who is about two years older than Student, received special education and related services. Mother repeatedly testified that she attended every meeting for her daughter and for Student. Mother also noted that she had signed many documents, and had received copies of the form advising her of parental rights.

78.    Student's parents received numerous copies of the Procedural Safeguards. For example, all three of Student's IEPs (May 11, 2004, March 8, 2005, and the February 7, 2006, which was continued to March 7, 2006) indicate that a copy of the Procedural Safeguards form was given to Student's parents. Mother signed all three of Student's IEPs. Mother also signed the consent-for-assessment form dated November 18, 2005, which indicated that she had received a copy of her rights. The District also sent a copy of the Procedural Safeguards to Student's parents in May 2004.

79.    Julie Harris, the principal at Student's school, attended the IEP team meetings on March 8, 2005 and February 7, 2006. The testimony of Ms. Harris and Mr. Buckley established that the Procedural Safeguards are always either offered to parents, or the IEP team ensures that parents received a copy. Parents who indicate that they are removing a pupil from school are encouraged to put that information into writing, so that the pupil's classmates can say good-bye.

80.    Ms. Dahlstrom talked with Mother on the first day of the 2006-2007 SY. The Log of Important Contacts indicates that this conversation occurred in August 2006, but the handwriting of the day of the meeting is not clear.[10] On Monday, August 28, 2006, Ms. Dahlstrom followed up on that conversation by calling Mother. Mother and Ms. Dahlstrom discussed Mother's concerns about Student and about Mother's investigations of other schools.

81.    Student's parents' exploration of Star Academy as a potential placement for Student progressed to arrangements to place Student there. Student's initial Star Academy Language Arts testing occurred on August 31, 2006. Student's Star Slingerland screening

---

[10] Ms. Dahlstrom believed that the conversation happened on August 27, 2006. However, the calendar indicates that that date was a Sunday.

began on September 14, 2006. Student's parents paid a $1,000 non-refundable deposit to Star on Monday, September 18, 2006, the first day of the Star school year. Mother believed that it might have been Student's first day at Star when, at the request of the District's school secretary, she put into writing the notice to the District that Student would be removed from school. Student's Star Academy Annual Goal forms are dated September 19, 2006.

82.     Student's departure from Sun Valley was abrupt. Ms. Harris was surprised that Student's parents removed him from her school without meeting with her. Student had two part-time GE teachers: Paula DeBlauuw, who taught Mondays through Wednesdays, and Elizabeth Nelson, who taught Thursdays and Fridays. Student was absent for a couple of days before Ms. DeBlauuw found a note from the school secretary taped to her mailbox on Wednesday, indicating that Student had been removed from school. Ms. Nelson did not learn that Student had been removed from Sun Valley until she found a note in her box from Ms. DeBlauuw. Ms. Dahlstrom did not know that Student had been removed from school until Student's teacher told her that Student was no longer attending school.

83.     Student notes that the Parental Rights Advisement entered into evidence is dated March 2006, around the time of Student's most recent IEP team meeting, and that the District never produced a copy of the previous form. However, the law regarding the notice requirements for a unilateral non-public school placement has not changed during the time period at issue in this case.

84.     The District complied with its duty to provide the notice of parental rights and procedural safeguards to Student's parents. Parents failed to notify the District, 10 business days before removing Student from Sun Valley, of their intent to do so. As a result, the amount of Student's Star Academy tuition that the District is required to pay will be reduced.

*Convene an IEP Team Meeting Upon Parental Request*

85.     A school district is required to convene an IEP team meeting within 30 days of a parental request.

86.     The 2006-2007 SY Log of Important Contacts indicates that, during the August 2006 conversation that Mother initiated with Ms. Dahlstrom, Ms. Dahlstrom indicated that a meeting would be held within two weeks to discuss the strategies for the 2006-2007 SY. On August 28, 2006, Ms. Dahlstrom called Mother to set up a team meeting. However, the meeting was postponed until after Student's parents' visit to a potential private school placement for Student. Ms. Dahlstrom called Mother in September 2006, but Mother stated that she did not want to meet "at this time." The entry concludes, "Considering Star Academy."

87.     Ms. Harris talked with Ms. Dahlstrom regarding the conversations with Mother. Ms. Harris believed that parents who express an interest in having an IEP team meeting outside the normal schedule are encouraged to put their request into writing, so that there is a written record of it.

88.     Testimony from Ms. Dahlstrom established that Mother would not agree to have an IEP team meeting. When Ms. Dahlstrom called Mother on August 28, 2006, Mother again expressed her concerns regarding Student, and said that she was not ready for an IEP team meeting. Ms. Dahlstrom continued to hope that a meeting, which could have ranged from informal to an IEP team meeting, could be scheduled, even after Mother told her that she was considering Star.

89.     Mother corroborated at least a portion of the District's Log of Important Contacts and Ms. Dahlstrom's testimony. Mother admitted that Ms. Dahlstrom had suggested having a meeting. After Mother received the results of Student's LindaMood Bell testing (which occurred on August 31, 2006, with the report signed on September 1, 2006), she was "very angry" and felt that the District school had put Student at a "huge disadvantage." When Ms. Dahlstrom suggested a meeting, Mother said that she would get back to Ms. Dahlstrom. Mother never did so.

90.     Student did not prove that his parents requested an IEP team meeting. In addition, when the District contacted Mother to suggest and/or schedule a meeting, Mother either declined, stated that she was not interested at that time, or indicated that she would get back to the District. Mother never did so. As a result, District did not violate its duty to schedule an IEP team meeting.

*Student's Unique Needs for the 2006-2007 SY*

91.     As noted in Factual Finding 52 through 55, Student had unique needs in the areas of reading, writing, and spelling.

*Goals for the 2006-2007 SY*

92.     As noted in Factual Findings 60 through 64, District failed to provide Student with a FAPE because the February-March 2006 IEP failed to include goals in the areas of writing and spelling.

*Placement for the 2006-2007 SY*

93.     As noted in Factual Finding 60 through 64, the February-March 2006 IEP team provided Student with a FAPE by offering four 30-minute sessions of RSP support. Student does not dispute the SL goals or services.

94.     As noted in Factual Findings 80 through 82, Student began the 2006-2007 SY at Sun Valley. He was removed from Sun Valley on about September 18, 2006.

*GE Teachers' Awareness of Student's IEP for the 2006-2007 SY*

95.     A school district must ensure that personnel working with a disabled pupil are aware of the requirements of the pupil's IEP.

96.     Student claims that his third grade GE teachers were unaware of his IEP.

97.     The general placement process at Sun Valley was that, prior to the end of the school year, teachers met to decide where to best place their current pupils the following year. The teachers kept in mind a need for class balance, including SE/GE, gender, and friends/enemies. The teachers would often note on the next year's class rosters those pupils who were eligible for special education and related services.

98.     Ms. Dahlstrom assembled a binder or folder for each SE pupil, which contained a variety of information, including pupil assessments, work products, and notes on IEPs or SSTs. One copy was kept in the pupil's classroom, and the other was kept in the RSP room. Ms. Dahlstrom reviews IEP goals with each teacher at the start of each school year.

99.     Sun Valley had a special IEP folder to which all teachers had access. In the fall of 2006, Ms. Harris paid for a substitute teacher for a day so that each teacher could meet with Ms. Dahlstrom to learn about their SE pupils and the IEP goals of those pupils.

100.    Ms. Nelson and Ms. DeBlauuw, Student's GE third grade teachers, had reviewed Student's binder. Ms. Nelson knew that Student had a learning disability before he came to her classroom, she had a copy of his IEP, and she had talked to Ms. Giraud about Student. Ms. DeBlauuw knew Student, and had known Student's sisters. Ms. DeBlauuw had talked to Ms. Dahlstrom and Ms. Giraud about topics such as what they were working on with Student, and the accommodations and modifications they had used for Student. Ms. DeBlauuw felt that, based on the discussions she had had, she could have written Student's goals without even seeing his documentation.

101.    Student's GE teachers were aware of his IEP. The District did not violate Student's right to a FAPE in this regard.

*Remedies*

102.    As described in Legal Conclusions 38 through 42, if a school district violates the right of a disabled pupil to receive a FAPE, the disabled pupil's parents may obtain reimbursement for education and services they procure for the pupil if those services are proper under the IDEA and reasonably calculated to provide educational benefit to the pupil. Compensatory education is an equitable remedy. Relief must be calculated to provide the educational benefit that would likely have accrued from the special education services that the school district should have provided. Reimbursement may be reduced or denied if the pupil's parents did not provide notice, prior to removing the pupil from the public school,

that rejects the placement, states their concerns, and expresses the intent to enroll the pupil in a non-public or private school. The conduct of both parties must be evaluated when determining what, if any, relief is appropriate. Several factors must be considered when determining the amount of reimbursement to be ordered: the efforts parents expended in securing alternative placements; the availability of other more suitable placements; and the cooperative or uncooperative position of the school district.

103.    As noted in Factual Findings 10 through 19 and 21 through 26, District violated Student's right to a FAPE for the 2004-2005 SY by failing to assess Student in the area of Language Arts, and by failing to provide goals in the areas of writing and spelling. Mother attempted to be an active participant in Student's education, and often voiced her concerns about Student's Language Arts needs to District personnel. Mother went to great lengths to secure additional tutoring resources and an alternative placement for Student. As a result, District must provide compensatory education.

104.    Student has requested compensatory education/reimbursement in the form of 200 hours of LindaMood Bell services, as determined by the August 31, 2006 assessment. Student's request is granted. The LindaMood Bell services will help to remediate the District's failures to provide FAPE during the 2004-2005 SY.

105.    As noted in Factual Findings 27 through 30, District violated Student's right to a FAPE for the 2005-2006 SY by failing to provide sufficient RSP support until about the second week of March 2006. As a result, District must provide compensatory education.

106.    Student has also requested reimbursement for $4500 paid to Ms. Ruppersburg for the tutoring services and IEP team meeting support. Student's request is granted, as set forth and reduced here. As noted in Factual Finding 64, Student is entitled to $2040 in reimbursement for Ms. Ruppersburg's tutoring and support from November 2005 to March 2006, as well as $700 in reimbursement for Ms. Ruppersburg's tutoring during June and July 2006. The tutoring services helped to remedy the District's failures to provide FAPE during the 2005-2006 SY.

107.    As noted in Factual Findings 22 through 26 and 56 through 59, District violated Student's right to a FAPE for the 2005-2006 SY, and for the 2006-2007 SY, by failing to provide goals in the areas of writing and spelling. As a result, District must provide compensatory education.

108.    Student has also requested reimbursement for $28,316 paid to the Star Academy. As noted in Factual Findings 80 through 82, on about September 18, 2007, Student's parents removed him from Sun Valley and placed him at the Star Academy, a non-public school in San Anselmo, California. Student's placement at Star Academy consisted of a homeroom where Student was taught the standard subjects, with pull-out services for SL issues, LindaMood Bell, and Slingerland.

However, as noted in Factual Findings 75 through 84, Student's parents failed to provide the District with the notice required by the law before removing Student from Sun Valley. As a result, any award of compensatory education to Student, applicable to Student's Star Academy tuition, will be reduced.

Student has not disputed any of the SL assessments, goals, or services provided by the District. Had Student remained at Sun Valley, he would have continued to receive SL services, as provided for by the February-March 2006 IEP. Student received the same level of SL services at the Star Academy – one 30-minute session per week. Therefore, the award of compensatory education to Student, as applicable to the tuition at the Star Academy, will be reduced to reflect this fact.
As to Student's homeroom subjects, Student would also have received this instruction had he remained at Sun Valley. The award will be reduced accordingly.

Student received the LindaMood Bell Seeing Stars program, four 30-minute sessions per week with one other pupil, and one 30-minute session per week on an individual basis. Kris Stephens, the service provider, was not a credentialed teacher, but he was qualified to provide the LindaMood Bell services to Student. Mr. Stephens documented Student's progress in June 2007: Student had mastered the first 200 sight words and was reading paragraphs. The services were proper under the IDEA and reasonably calculated to provide educational benefit for Student. According to the District's calculations, as illustrated by the three IEPs in evidence, one 30-minute session per week equals approximately two percent of Student's school day. At Star Academy, Student received five 30-minute sessions of LindaMood Bell services during the 2006-2007 SY. Accordingly, compensatory education in the form of reimbursement will be awarded in the amount of 10 percent of the Star Academy tuition.

Student received one-to-one Slingerland services for four 30-minute sessions per week. Ellen Wood, who had previously earned a teaching credential and taught for several years, was the service provider. Ms. Wood documented Student's progress in June 2007: Student could decode a mixed list of nonsense words with 70+ percent accuracy four out of five times, and could read the nonsense words at an accuracy rate between 60 percent and 100 percent. Student was also making progress on blending sounds, and with reading in the Read Naturally program. The services were proper under the IDEA and reasonably calculated to provide educational benefit for Student. Accordingly, compensatory education in the form of reimbursement will be awarded in the amount of eight percent of the Star Academy tuition.

In addition, consideration of other equitable factors indicates that an additional award of compensatory education, in the form of tuition reimbursement, is appropriate. Mother went to considerable lengths to try to get assistance for Student. Had District appropriately acknowledged Mother's concerns, additional resources – in the form of additional RSP time and services – were readily available. Accordingly, additional compensatory education in the form of reimbursement will be awarded in the amount of 10 percent of the Star Academy

tuition. Student's request for reimbursement is granted, for 28 percent of the Star Academy tuition, in the amount of $7,928.48.

## LEGAL CONCLUSIONS

*Foundational Legal Principles*

1.      Student has the burden of proving the essential elements of his special education claims. (Schaffer v. Weast (2005) 546 U.S. 49 [126 S.Ct. 528, 163 L.Ed.2d 387].)

2.      Pursuant to California special education law, the Individuals with Disabilities in Education Act (IDEA), and the Individuals with Disabilities in Education Improvement Act of 2004 (IDEIA), children with disabilities have the right to a FAPE that emphasizes special education and related services designed to meet their unique needs and to prepare them for employment and independent living. (20 U.S.C. §1400 et al.;[11] Ed. Code, § 56000.) A FAPE is defined in pertinent part as special education and related services that are provided at public expense and under public supervision and direction, that meet the State's educational standards, and that conform to the student's IEP. (§ 1401(9); Cal. Code Regs., tit. 5, § 3001, subd. (o).) "Special education" is defined in pertinent part as specially designed instruction and related services, at no cost to parents, to meet the unique needs of a child with a disability. (§ 1401(29); Ed. Code, § 56031.) "Related services," known in California law as Designated Instruction and Services (DIS), means transportation and other developmental, corrective and supportive services that may be required to assist the child to benefit from special education. (§ 1401(22); Ed. Code § 56363, subd. (a).)

3.      There are two parts to the legal analysis in suits brought pursuant to the IDEA. First, the court must determine whether the school system has complied with the procedures set forth in the IDEA. (Bd. of Ed. of the Hendrick Hudson Sch. Dist v. Rowley (1982) 458 U.S. 176, 200 [Rowley].) Second, the court must assess whether the IEP developed through those procedures was designed to meet the child's unique needs, reasonably calculated to enable the child to receive educational benefit, and comported with the child's IEP. (Id. at pp. 206-207.)

4.      In Rowley, the United States Supreme Court recognized the importance of adherence to the procedural requirements of the IDEA. But procedural violations constitute a denial of FAPE only if the violations impeded the pupil's right to a FAPE, significantly impeded the ability of the pupil's parents to participate in the decision-making process regarding the provision of a FAPE to the pupil, or caused a deprivation of educational benefits to the pupil. (Rowley, supra, 458 U.S. at pp. 206-207; M.L. v. Federal Way Sch. Dist. (9th Cir. 2004) 394 F.3d 634, 646; MM v. Sch. Dist. of Greenville County (4th Cir.

---

[11] All statutory references are to the Individuals with Disabilities Education Act (IDEA), Title 20 of the United State Code, unless specifically noted otherwise.

2002) 303 F.3 523, 534; Amanda J. v. Clark County Sch. Dist. (9th Cir. 2001) 267 F. 3d 877, 892; § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (j).)

5.  A parent has meaningfully participated in the development of an IEP when he is informed of his child's problems, attends the IEP meeting, expresses his disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (N.L. v. Knox County Schools (6th Cir. 2003) 315 F.3d 688, 693; Fuhrmann v. East Hanover Bd. of Educ. (3rd Cir. 1993) 993 F.2d 1031, 1036 [parent who has an opportunity to discuss a proposed IEP and whose concerns are considered by the IEP team has participated in the IEP process in a meaningful way].) While the IEP team should work toward reaching a consensus, the school district has the ultimate responsibility to determine that the IEP offers a FAPE. (App. A to 34 C.F.R. Part 300, Notice of Interpretation, 64 Fed. Reg. 12473 (Mar. 12, 1999).)

6.  The second prong of the Rowley test analyzes substantive appropriateness, specifically, the level of instruction and services that must be provided to a student with disabilities to satisfy the IDEA's requirements. The Rowley Court determined that a student's IEP must be designed to meet the student's unique needs, be reasonably calculated to provide the student with some educational benefit, and comport with the student's IEP. (Rowley, supra, 458 U.S. at pp. 188-189, 200-201.) To determine whether the District offered Petitioner a FAPE, the analysis must focus on the adequacy of the District's proposed program. (Gregory K. v. Longview Sch. Dist. (9th Cir. 1987) 811 F.2d 1307, 1314.) A school district must offer a program that is reasonably calculated to provide more than a trivial or minimal level of progress. (Amanda J., supra, 267 F.3d at p. 890, citing Hall v. Vance County Bd. of Educ. (4th Cir. 1985) 774 F.2d 629, 636.)

However, an IEP need not conform to a parent's wishes in order to be sufficient or appropriate. (Shaw v. Dist. of Columbia (D.C. 2002) 238 F.Supp.2d 127, 139 [IDEA does not provide for an "education . . . designed according to the parent's desires"], citing Rowley, supra, 458 U.S. at p. 207.) Nor does the IDEA require school districts to provide special education students with the best education available or to provide instruction or services that maximize a student's abilities. (Rowley, supra, 458 U.S. at pp. 198-200.) Rather, the Court held that school districts are required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the student. (Id. at p. 200.) Hence, if the school district's program met the substantive Rowley factors, then that district provided a FAPE, even if petitioner's parents preferred another program and even if his parents' preferred program would have resulted in greater educational benefit. (Gregory K., supra, 811 F.2d at p. 1314.)

7.  Moreover, the Rowley opinion established that, as long as a school district provides an appropriate education, methodology is left up to the district's discretion. (Rowley, supra, 458 U.S. at p. 208.) "The Rowley standard recognizes that courts are ill-equipped to second-guess reasonable choices that school districts have made among appropriate instructional methods." (T.B. v. Warwick Sch. Comm. (1st Cir. 2004) 361 F.3d

80, 84; citing Roland M., supra, 910 F.2d at pp. 992-993, and Rowley, supra, 458 U.S. at pp. 207-208; Adams, supra, 195 F.3d at pp. 1146-1150.)

*For the 2004-2005 SY, did the District fail to assess Student in the areas of Language Arts and Math Facts?*

8.    Under State law, a child may be referred for special education only after the resources of the regular education program have been considered and, where appropriate, utilized. (Ed. Code § 56303.) Once a child has been referred for assessment, the school district must assess the child in all areas of suspected disability. (34 C.F.R. § 300.304(c)(4); Ed. Code § 56320, subd. (f).)

9.    As determined in Factual Findings 1 through 4 and 7 through 9, and Legal Conclusions 8, Student did quite well in Math Facts during the 2004-2005 SY. He met or exceeded about 79 percent of the grade level standards, continuing the Math Facts success he achieved in kindergarten. Accordingly, Math Facts was not an area of suspected disability, and District had no duty to assess Student in the area of Math Facts.

10.    As determined in Factual Findings 1 through 4 and 10 through 18, as well as Legal Conclusion 8, Student demonstrated an area of suspected disability in Language Arts. He was, among other things, twice referred to SSTs for Language Arts problems, and was receiving SL services for articulation problems, which are statistically linked to reading problems. Accordingly, District failed to assess Student in all areas of suspected disability, because District did not assess Student in the area of Language Arts.

*For the 2004-2005 SY, did the District deny Student a FAPE by failing to include goals in the areas of spelling, writing, math, and reading?*

11.    An IEP must include, among other things, the child's present levels of educational performance, measurable annual goals, the special education, related services, and supplementary aids and services to be provided, as well as a statement of how the child's progress toward the annual goals will be measured. (§§ 1414(d)(1)(A)(i), (ii), (iii) and (vii)(I); 34 C.F.R. § 300.320; Ed. Code, § 56345, subd. (a)(1), (2), (3) and (9).) The measurable annual goals must be designed to meet the pupil's needs that result from the pupil's disability, in order to enable the child to be involved in and make progress in the general education curriculum, and that meet the pupil's other educational needs that result from his or her disability. (§ 1414(d)(1)(A)(i)(II); Ed. Code, § 56345, subd. (a)(2).) Such goals enable the pupil, parents, and educators to monitor progress and to revise the IEP consistent with the student's instructional needs. (Appen. A to 34 C.F.R. Part 300, Notice of Interpretation, 64 Fed. Reg. 12471 (Mar. 12, 1999).) While the required elements of the IEP further important policies, "rigid 'adherence to the laundry list of items [required in the IEP]' is not paramount." (W.G. v. Bd. Of Trustees of Target Range Sch. Dist. No. 23 (9th Cir. 1992) 960 F.2d 1479, 1484, citing Doe v. Defendant I (6th Cir. 1990) 898 F.2d 1186, 1190-1191.) Because "[a]n IEP is a snapshot, not a retrospective" (Adams v. Oregon (9th Cir.

28

1999) 195 F.3d 1141, 1149), it is not to be evaluated in hindsight. Rather, an IEP must be evaluated in light of the information available, and what was objectively reasonable, at the time the IEP was developed. (Roland M. v. Concord Sch. Comm. (1st Cir. 1990) 910 F.2d 983, 992.)

12.     As determined in Factual Findings 1 through 4, 7 through 9, and 19 through 20, as well as Legal Conclusions 1 through 7 and 11, Student did not have unique needs in the area of Math Facts. Accordingly, District had no obligation to develop goals in the area of Math Facts.

13.     As determined in Factual Findings 1 through 4, 10 through 19, and 21, as well as Legal Conclusions 1 through 7 and 11, Student had unique needs in the area of Language Arts, in the areas of spelling, writing, and reading – decoding, blending, fluency, and sight words. District developed an appropriate reading goal that covered Student's unique needs in that area, including the areas of decoding, blending, fluency, and sight words. However, District failed to develop goals in the areas of spelling and writing. According, District failed to provide Student with a FAPE by failing to address Student's unique needs in the areas of spelling and writing.

*For the 2004-2005 SY, did the District deny Student a FAPE by failing to provide sufficient RSP services?*

14.     As determined in Factual Findings 27 through 30, and Legal Conclusions 1 through 7 and 11, District did not offer RSP services until May 2005. However, Student had unique needs in the area of Language Arts during the 2004-2005 SY that required more than the two 30-minute RSP sessions offered in May 2005. This is particularly important due to the fact that District had no formal assessments upon which it could base its offer of two 30-minute sessions of RSP services. Furthermore, Student made only minimal progress, even while receiving two 30-minute RSP sessions per week. Accordingly, District violated Student's right to a FAPE by failing to provide sufficient RSP services.

*For the 2004-2005 SY, did the District deny Student a FAPE by failing to specify the delivery model for SL services?*

15.     A school district is required to make a formal, specific written offer of placement and services. (Union Sch. Dist. v. Smith (9th Cir. 1994) 15 F.3d 1519, 1526.) A key aspect of a parent's right to participate in the IEP process is the school district's obligation to make a formal written offer which clearly identifies the proposed program. (Ibid.) The requirement that a school district make a specific written offer of placement has an important purpose that is not merely technical and should be rigorously enforced. (Ibid.)

16.     Based on Factual Findings 31 through 38, and Legal Conclusions 1 through 5 and 15, the May 2004 IEP was unclear as to the location of the SL services, since the boxes for both Student's GE classroom, and for another room, were checked. In addition, the IEP did not specify direct or consult services – neither of those boxes was checked. As a result of

29

the confusing nature of the IEP's location and direct-consult information, District failed to provide a clear offer of the SL services to be provided to Student.

*For the 2005-2006 SY, did the District deny Student a FAPE by failing to convene a timely IEP team meeting, and by failing to have all required members of the IEP team present?*

17.      A school district shall develop a proposed assessment plan within 15 calendar days of referral for assessment, unless the parent agrees in writing to an extension (Ed. Code, § 56043, subd. (a)), and shall attach a copy of the notice of parent's rights to the assessment plan (Ed. Code, § 56321, subd. (a)). A parent shall have at least 15 calendar days from the receipt of the proposed assessment plan to arrive at a decision whether to consent to the assessment plan. (Ed. Code, § 56403, subd. (b).) A school district cannot conduct an assessment until it obtains the written consent of the parent prior to the assessment (unless the school district prevails in a due process hearing relating to the assessment); assessment may begin immediately upon receipt of the consent. (Ed. Code, § 56321, subd. (c).) Thereafter, a school district must develop an IEP, required as a result of an assessment, no later than 60 calendar days, not counting school holidays longer than five school days, from the date of receipt of the parent's written consent to assessment, unless the parent agrees in writing to an extension. (Ed. Code, § 56043, subds. (c) & (f).)

18.      Based on Factual Findings 39 through 49, and Legal Conclusions 1 through 5 and 17, District failed to timely hold an IEP team meeting and produce an IEP. The deadline to do so was February 7, 2006, 60 days after Mother signed the assessment plan on November 29, 2005, not counting the 10-school-day break at the end of 2005. Student's IEP was not produced until March 7, 2006.

19.      State and federal law requires that the parents of a child with a disability be afforded an opportunity to participate in meetings with respect to the identification, assessment, educational placement and provision of a FAPE to the child. (Ed. Code §§ 56304, 56342.5; 34 C.F.R. § 300.501(b).) Thus, parents are required members of the IEP team, which also includes at least one of the child's general education teachers (if the child is or may be participating in the general education environment), at least one special education teacher or provider who provides special education to the child, a representative of the local education agency, an individual who can interpret the instructional implications of the assessments, other individuals who have knowledge or special expertise regarding the child (depending on the discretion of the parents or local education agency), and, whenever appropriate, the disabled child. (§ 1414(d)(1)(B)(i)-(vii); 34 C.F.R. § 300.321(a)(1)-(7); Ed. Code § 56341, subd. (b).) Education Code section 56341.1 also requires the IEP team to consider, among other matters, the strengths of the pupil and the results of the initial assessment or most recent assessment of the pupil. The IEP team must consider the concerns of the parents throughout the IEP process. (§ 1414(c)(1)(B), (d)(3)(A)(i), (d)(4)(A)(ii)(III); 34 C.F.R. §§ 300.305(a)(i), 300.324(a)(1)(ii), (b)(1)(ii)(C); Ed. Code § 56341.1, subds. (a)(1), (d)(3), (e).)

20.     Based on Factual Findings 39 through 49, and Legal Conclusions 1 through 5 and 17, District failed to convene a properly-constituted IEP team, because Ms. Dahlstrom was not at the February 7, 2006 IEP team meeting. District was required to have a special education teacher or provider at that IEP team meeting. As Ms. Dahlstrom, Student's RSP provider, acknowledged during the hearing, her presence at the IEP team meeting was "critical," because this IEP team meeting was the setting for the team's consideration of Student's additional eligibility due to a specific learning disability, and for the team's consideration of increasing the level of RSP services provided to Student due to his specific learning disability.

21.     However, as noted in Factual Finding 50, these violations did not prevent Student's parents from meaningfully participating in the IEP process, nor did they result in the loss of an educational benefit to Student. On February 10, 2006, Ms. Dahlstrom called Mother and received her permission to double Student's RSP services – by adding two 30-minute sessions of RSP support per week, as was proposed in the draft IEP. In addition, Mother wanted to have Ms. Ruppersburg present at the IEP team meeting. Accordingly, District's procedural violations of failing to convene a timely and properly-constituted IEP team meeting were harmless.

*For the 2005-2006 SY, did the District deny Student a FAPE by failing to include goals in the areas of spelling, writing, and reading?*

22.     Based on Factual Findings 51 through 58, and Legal Conclusions 1 through 7 and 11, the District properly provided a measurable reading goal that addressed Student's unique needs in the areas of decoding, blending, fluency, and sight words. Accordingly, the District provided Student a FAPE in the area of reading.

23.     However, Based on Factual Findings 51 through 59, and Legal Conclusions 1 through 7 and 11, District failed to include in the IEP goals in the areas of writing or spelling. Student's grades, Ms. Giraud's comments, and the District's assessments clearly identified these areas of unique need for Student. As a result, District denied Student's right to a FAPE in the Language Arts areas of writing and spelling, by failing to develop goals to meet Student's unique needs in these areas.

*For the 2005-2006 SY, did the District deny Student a FAPE by failing to provide sufficient RSP services?*

24.     Based on Factual Findings 60 through 64, and Legal Conclusions 1 through 7 and 11, for the portion of the SY up until March 2006, the District failed to provide sufficient RSP services for Student. Two 30-minute sessions per week were not designed to meet Student's unique needs and were not reasonably calculated to provide more than trivial educational benefit. District denied Student a FAPE for this portion of the SY.

25.     However, Based on Factual Findings 60 through 64, and Legal Conclusions 1 through 7 and 11, the District's offer of four 30-minute RSP sessions per week were designed to meet Student's unique needs and reasonably calculated to provide some educational benefit. Student's educational progress, with this level of support, was demonstrated by his second grade report card grades and Ms. Giraud's third trimester comments. Student's progress was also corroborated his June 2006 benchmark progress notes.

*For the 2005-2006 SY, did the District deny Student a FAPE by failing to specify the delivery model for SL services?*

26.     Based on Factual Findings 65 through 69, and Legal Conclusions 1 through 5 and 15, the IEP was unclear as to the location of the SL services, because the Speech Room was listed, while the boxes for both Student's GE classroom, and for another room, were checked. The lack of clarity constituted a procedural violation.

27.     However, the procedural violation did not result in a denial of FAPE. The District's specificity violation did not prevent Student's parents from meaningfully participating in the IEP process, nor did it result in the loss of an educational opportunity to Student. Student does not dispute the SL assessment, the SL goals, or the services provided. The violation was harmless.

*For the 2005-2006 SY, did the District deny Student a FAPE by failing to offer ESY services?*

28.     A school district may be required to provide, in addition to special education and related services during the regular academic school year, ESY services to pupils who have disabilities that are likely to continue indefinitely or for a prolonged period, if interruption of the pupil's educational programming may cause regression, coupled with the pupil's limited recoupment capacity, rendering it impossible or unlikely that the pupil will achieve the level of self-sufficiency and independence that would otherwise be expected in light of his or her disability. (Ed. Code, § 56345, subd. (b)(3); Cal. Code Regs., tit. 5, § 3043; see also 34 C.F.R. 300.106.)

29.     Based on Factual Findings 70 through 74, and Legal Conclusions 1 through 7 and 28, District denied Student a FAPE by failing to provide ESY services to Student. Student required ESY services, as established by Ms. Ruppersburg, his history of Language Arts problems, and the brief period of time (about 3 months) that District had been providing a FAPE as to RSP services. Accordingly, District denied Student a FAPE by failing to provide ESY services.

*For the 2006-2007 SY, did the District deny Student a FAPE by failing to provide parents with notice of their parental rights?*

30.     A school district must provide parents with a copy of the procedural safeguards at least once a year, as well as upon the initial referral or parent request for assessment, the first occurrence of filing a request for due process hearing, or parent request. (§ 1415(d)(1)(A); Ed. Code, § 56301, subd. (d)(2).) The procedural safeguards must include a full explanation, in an easily understandable matter, of the procedural safeguards including, among other things, the requirements for unilateral placement by parents of pupils in private or non-public schools at public expense. (§ 1415(d)(2); Ed. Code, § 56321.)

31.     Based on Factual Findings 75 through 84, and Legal Conclusions 1 through 5 and 30, District complied with its duty to provide the notice of parental rights and procedural safeguards to Student's parents. The form used by the District to do so clearly notified Student's parents that they were required to give the District written notice of their intent to remove Student from the District school at least 10 business days prior to the removal. Parents failed to do so. In addition, Mother was an experienced member of the IEP team, and had received multiple copies of the procedural safeguards form. Accordingly, any award of compensatory education, in the form of reimbursement, will be reduced.

*For the 2006-2007 SY, did the District deny Student a FAPE by failing to timely convene an IEP team meeting upon parental request?*

32.     A school district is required to convene an IEP team meeting within 30 days of a parental request. (Ed. Code, § 56343.5.)

33.     Based on Factual Findings 85 through 90, and Legal Conclusions 1 through 5 and 32, Student did not prove that his parents requested an IEP team meeting. In addition, when the District contacted Mother to suggest and/or schedule a meeting, Mother either declined, stated that she was not interested at that time, or indicated that she would get back to the District. Mother never did so. Accordingly, District did not violate its duty to schedule an IEP team meeting.

*For the 2006-2007 SY, did the District deny Student a FAPE by failing to include goals in the areas of spelling, writing, and reading?*

34.     Based on Factual Findings 91 and 92, and Legal Conclusions 1 through 7 and 11, the February-March 2006 IEP included three goals to address Student's Language Arts difficulties, one each for reading fluency, reading comprehension (that included decoding and blending), and sight words. The three goals were appropriately measurable, and were designed to address Student's unique needs in the areas of reading, decoding, blending, fluency, and sight words.

35.     However, the February-March IEP did not include goals in the areas of writing or spelling. Student's grades, Ms. Giraud's comments, and the District's assessments clearly identified these areas of unique need for Student. As a result, District denied Student's right to a FAPE in the Language Arts areas of writing and spelling, by failing to develop goals to meet Student's unique needs in these areas.

33

*For the 2006-2007 SY, did the District deny Student a FAPE by failing to ensure Student's GE teachers were aware of Student's IEP?*

36.    A school district must ensure that personnel working with a disabled pupil are aware of the requirements of the pupil's IEP. (Ed. Code, § 56347.)

37.    Based on Factual Findings 95 through 101, and Legal Conclusions 1 through 5 and 36, District met its obligation to ensure that Student's GE teachers were aware of his IEP. Sun Valley's cooperative system of assigning pupils to classes for the upcoming school year ensured teacher awareness of the pupils who would be in their class the following school year, including whether those pupils were entitled to special education and related services. Ms. Nelson and Ms. DeBlauuw were aware of Student's IEP. They had, among other things, reviewed Student's binder and talked to Ms. Giraud about Student's unique needs.

*Compensatory Education*

38.    Parents may be entitled to reimbursement for the costs of placement or services they have procured for their child when: (1) the school district failed to provide a FAPE; and (2) the private placement or services procured are (a) proper under IDEA and (b) reasonably calculated to provide educational benefit to the child. (20 U.S.C. § 1412(a)(10)(C); School Committee of the Town of Burlington v. Dept. of Education (1985) 471 U.S. 359, 369-370 [Burlington]; Student W. v. Puyallup Sch. Dist. (9th Cir. 1994) 31 F.3d 1489, 1496.) Parents need not provide the exact proper placement or services required under IDEA, but rather must only provide a placement or services that address the student's needs and provides the student with educational benefit. (Florence County Sch. Dist., Four v. Carter (1993) 510 U.S. 7, 13 [114 S.Ct. 361]; Alamo Heights Indep. Sch. Dist. v. State Board of Educ. (5th Cir. 1986) 790 F.2d 1153, 1161.)

39.    The right to compensatory education does not create an obligation to automatically provide day-for-day or session-for-session replacement for the opportunities missed. (Park v. Anaheim Union Sch. Dist. (9th Cir. 2006) 464 F.3d 1025, 1033, citing Student W., supra, 31 F.3d at 1496.) Compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting "appropriate relief." (Student W., supra, 31 F.3d at 1497; see also Burlington, supra, 471 U.S. at p. 374 [equitable considerations are relevant in fashioning relief].) "The conduct of both parties must be reviewed to determine whether relief is appropriate." (W.G., supra, 960 F.2d at p. 1486; see also Student W., supra, 31 F.3d at p 1496.) Factors to be considered when determining the amount of reimbursement to be awarded include the existence of other, more suitable placements; the effort expended by the parent in securing alternative placements; and the general cooperative or uncooperative position of the school district. (W.G., supra, 960 F.2d at p. 1487; Glendale Unified Sch. Dist. v. Almasi (C.D. Cal. 2000) 122 F.Supp.2d 1093, 1109.) The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have

supplied in the first place." (Reid ex. rel. Reid v. District of Columbia (D.D.C. Cir. 2005) 401 F.3d 516, 524.)

40.     A district is not required to pay for the cost of education, including special education and related services, for a pupil attending non-public or private school fi the district made a FAPE available to the pupil and the pupil's parents chose to place the pupil in the non-public or private school. (§1412(a)(10)(C)(i); 34 C.F.R. § 300.148(a); Ed. Code, § 56174.)

41.     A district may be required to reimburse a pupil's parents for the costs of a non-public or private school if the child previously received special education and related services from the district, and the district failed to make a FAPE available to the pupil. (§1412(a)(10)(c)(ii); 34 C.F.R. § 300.148(c); Ed. Code, § 56175.)

42.     Reimbursement may be denied or reduced if the parents do not give the school district notice of their intent to remove their child from public school before they do so. (§ 1412(a)(10)(C)(iii)(I); 34 C.F.R. § 300.148(d); Ed. Code, § 56176.) Pursuant to these provisions, parents must provide such notice at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, or by written notice ten business days prior to the removal of the child from the public school that included a statement of the parents' concerns. (§ 1412(a)(10)(C)(iii)(I); 34 C.F.R. § 300.148(d); Ed. Code, § 56176.) However, reimbursement cannot be reduced or denied for failing to provide notice of intent to remove a pupil from the public school if, among other things, the parents were not informed of the notice requirement. (§ 1412(a)(10)(C)(iv)(I); 34 C.F.R. § 300.148(e)(1); Ed. Code, § 56177, subd. (a).)

43.     Based on Factual Findings 102 through 108, and Legal Conclusions 1 through 7 and 38 through 42, Student is entitled to 200 hours of LindaMood Bell services, as determined by the August 31, 2006 assessment, plus $2040 in reimbursement for Ms. Ruppersburg's tutoring and support from November 2005 to March 2006, plus $700 in reimbursement for Ms. Ruppersburg's tutoring during June and July 2006, plus $7,928.48 reimbursement for tuition paid for the Star Academy.

## ORDER

1.     District is ordered to provide 200 hours of Lindamood Bell services, to be completed before January 2008.

2.     District is ordered to reimburse Student's parents $10,668.48, within 30 days of the date of this order.

## PREVAILING PARTY

Education Code section 56507, subdivision (d), requires a decision to indicate the extent to which each party prevailed on each issue heard and decided. Student prevailed on Issue 1 to the extent that the District failed to assess in the area of language arts. Student prevailed on Issue 2(a) to the extent that District failed to provide goals in the areas of writing and spelling. Student prevailed on Issue 2(b). Student prevailed on Issue 3(c), to the extent that District failed to provide goals in the areas of writing and spelling. Student prevailed on Issue 3(d), to the extent that District failed to provide sufficient RSP services until the March 2006 IEP. Student prevailed on Issue 3(f). Student prevailed on Issue 4(c), to the extent that District failed to provide goals in the areas of writing and spelling. District prevailed on all other issues.

## RIGHT TO APPEAL THIS DECISION

The parties to this case have the right to appeal this Decision to a court of competent jurisdiction. If an appeal is made, it must be made within 90 days of receipt of this decision. (Ed. Code, § 56505, subd. (k).)

Dated: August 13, 2007

JOHN A. THAWLEY
Administrative Lawivision
Office of Administrative Hearings

36

## PROOF OF SERVICE

I, **Rosie Ruiz**, declare as follows: I am over 18 years of age and have no interest in the action within; my place of employment and business address is:

**Office of Administrative Hearings**
**Special Education Division**
**2349 Gateway Oaks, Suite 200**
**Sacramento, CA 95833-4231**

On **August 13, 2007**, I served a copy of the following entitled action:

**DECISION - OAH CASE NO. - 2007050679**

to each of the person(s) named below, at the address set out next to each name, by the following method:

Dale and Zelda Mellor
241 Solano Street
San Rafael, CA 94901

Margaret M. Broussard, Esq.
Attorney at Law
7909 Waterga Road, Suite 112,
PMB 1157
Antelope, CA 95843

David E. Lyon, Esq.
Ruiz & Sperow, LLP.
2000 Powell Street #1655
Emeryville, CA 94608

☒ **US MAIL** — by enclosing the action in a sealed envelope and placing the envelope for collection and mailing on that date and at the Office of Administrative Hearings, City of Sacramento, County of Sacramento, State of California, following ordinary business practices. I am readily familiar with the Office of Administrative Hearings' practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

   XX Regular Mail

☒ **FACSIMILE TRANSMISSION** — by personally transmitting to the above-named person(s), who has previously agreed to receive documents via facsimile transmission, to the facsimile number(s) shown above, on the date and time listed below, from facsimile machine number (916) 263-0554, pursuant to California Rules of Court, rules 2003-2008, Government Code section 11440.20, and California Code Regulations, title I, section 1008, subdivision (d). A true copy of the above-described documents(s) was transmitted by facsimile transmission and the transmission was reported as complete and without error. A copy of the transmission report, properly issued by the transmitting machine, is attached to this proof of service.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct, and this Declaration was executed at **Sacramento, California** at

**1:35 PM** on the **13** of **August**, 2007. _____
                                                              Rosie Ruiz