CELIA M. RUIZ, SBN 87671
DAVID E. LYON, SBN 133065
OK-HEE SHIM, SBN 240998
RUIZ & SPEROW, LLP
2000 Powell Street, Suite 1655
Emeryville, CA 94608
Telephone: 510-594-7980
Fax: 510-594-7988

Attorneys for Plaintiff
SAN RAFAEL CITY SCHOOLS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN RAFAEL CITY SCHOOLS<br><br>Plaintiff,<br><br>v.<br><br>OFFICE OF ADMINISTRATIVE HEARINGS,<br><br>Defendant. | Case No. C07-4702 WHA<br>Related Case No. C07-5751 BZ |
| Related Case:<br><br>T.M., a minor,<br><br>Plaintiff,<br><br>v.<br><br>SAN RAFAEL CITY SCHOOLS,<br><br>Defendant | Date:  March 6, 2008<br>Time:  08:00 a.m.<br>Location: Courtroom 9, 19th Floor<br>Hon. William H. Alsup |

**PLAINTIFF SAN RAFAEL CITY SCHOOLS' BRIEF IN SUPPORT OF**

**MOTION FOR SUMMARY JUDGMENT/REVIEW**

# TABLE OF CONTENTS

Page No.

I.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    LEGAL STANDARDS FOR REIMBURSEMENT . . . . . . . . . . . . . . . . . . . . 2
    C.    THE LEAST RESTRICTIVE ENVIRONMENT REQUIREMENT . . . . . . . . . . 4
    D.    STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  THE FACT OF TM'S BENEFIT FROM THE DISTRICT SERVICES PROVES
    HE WAS PROVIDED A FREE AND APPROPRIATE PUBLIC EDUCATION . . . . . . 5

IV.   THE DISTRICT PROPERLY ASSESSED TM IN LANGUAGE ARTS IN FIRST
    GRADE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.    STATUTE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    B.    THE DISTRICT'S ASSESSMENTS WERE REASONABLE . . . . . . . . . . . . . . 7

        1.    Informal/Observational Assessments . . . . . . . . . . . . . . . . . . . . . . . 7
        2.    Abundant Formal Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            a.    Report Card Test Based and Observational Assessments . . . . . . . . 8
            b.    AIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            c.    Houghton Mifflin Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            d.    Classwork . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            e.    Classroom Symptoms Checklist And SST Referral . . . . . . . . . . . . 9
            f.    SST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            g.    Post-SST Global Language Assessment – CELF 3 and Test of
               Phonological Awareness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            h.    IEP Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            i.    Post IEP Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    C.    THE DISTRICT'S ASSESSMENTS WERE PROPER                   11
    D.    ANY FAILURE TO CONDUCT EVEN MORE ASSESSMENTS WAS
        WITHOUT CONSEQUENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.    THE DISTRICT PROVIDED AN APPROPRIATE LEVEL OF SPECIAL EDUCATION
    SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.    THE ADMINISTRATIVE DECISION CONTRAVENES THE APPLICABLE
        STATUE OF LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    B.    SERVICES IN THE GENERAL EDUCATION ENVIRONMENT . . . . . . . . . 13

        1.    Services in the First Grade General Education Classroom . . . . . . . . . 13
        2.    Services in the Second Grade General Education Classroom . . . . . . . . 15
        3.    The Determination Of The Level Of Resoure Specialist Services Was
          Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            a.    No fixed formula . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            b.    The Constraints of the Mainstreaming Requirement . . . . . . . . . . 16
            c.    RSP Time Should Be Provided In Increments . . . . . . . . . . . . . . . 17

## TABLE OF CONTENTS (Cont'd.)

Page No.

VI.   THE DISTRICT DID NOT DENY REAL PARTY FAPE BY FAILING TO
STATE SPECIFIC GOALS FOR SPELLING AND WRITING . . . . . . . . . . . . . . . . . . . 18

VII.  THE DESIGNATION OF SPEECH AND LANGUAGE SERVICES GIVES RISE
TO NO CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VIII. TM FAILED TO PROVE HE QUALIFIED FOR ESY  . . . . . . . . . . . . . . . . . . . . . . 22

IX.   REIMBURSEMENT IS NOT PROPER BECAUSE TM'S UNILATERAL
PLACEMENTS VIOLATED THE MAINSTREAM REQUIREMENT AND WERE
OTHERWISE INAPPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

X.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

**Cases**                                                                 Page Nos.

Amanda J. Ex rel. Annette J. vs. Clark County School Dist. (9th Cir. 2001)
    267 F.3d 877 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Board of Educ. Of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley
    458 U.S. 176 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Board of Education of Tp. High School Dist. No. 211 v. Ross (7th Cir. 2007)
    2007 WL 1374919, 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Capistrano Unified School Dist. vs. Wartenberg By and Through Wartenberg (9th Cir. 1995)
    59 F.3d 884 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Cleveland Heights-University Heights City Sch. Dist. vs. Boss
    144 F.3d 391 (6ht Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

E.S. v. Independent School District (8th Cir. 1997)
    135 F.3d 566 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Florence County School Dist. Four v. Carter By and Through Carter (1993)
    510 U.S. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Gregory K. vs. Longview School Dist. (9th Cir. 1987)
    811 Fl.2d 1307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Lauren W. Ex rel. Jean W. vs. Deflaminis (3d Cir. 2007)
    480 F.3d 259 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Leake by Shreve v. Berkeley County Bd. Of Educ. (N.D.W.Va 1997)
    965 F.Supp. 838 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Miller ex rel. Miller v. San Mateo-Foster City Unified Sch. Dist. (N.D. Cal. 2004)
    318 F. Supp. 2d 851 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

Ms. Ex rel. S.S. v. Board of Educ. Of the City School Dist. Of Yonkers (2d Cir. 2000)
    231 F.3d 96 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Ms. S. Ex rel. G. v. Vashon Island School Dist. (9th Cir. 2003)
    337 F.3d 1115 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

R.B., ex rel. F.B. v. Napa Valley Unified School Dist. (9th Cir. 2007)
    496 F.3d 932 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Ravenswood Elementary School District and Sequoia Union High School District
    Case No. SN 988-97, SEHO 1997-988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Sacramento City Unified School Dist., Bd. Of Educ. vs. Rachel H. By
and Through Holland (9th Cir. 1994)
    14 F. 3d 1398 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Walczak v. Florida Union Free School Dist. (2d Cir. 1998)
    142 F.3d 119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Statutes, Codes**

California Education Code
    section 56175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    section 56341.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    section 56342 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    section 56345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

20 United States Code
    section 1400, et seq. ("IDEA") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    section 1401(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    section 1412(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    section 1414(d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    section 1415(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    section 1415(f)(3)(E)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1    San Rafael City Schools ("District") appeals the adverse portions of the Decision of the

2    California Office of Administrative Hearings ("Decision") on Real Party TM's ("TM") due process

3    claim under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C.§1400, et seq., and

4    enacting state legislation. *See* Decision, 1876-1911.[1] The Decision denied relief on eight of TM's 13

5    claims, but granted partial relief on five.  These adverse findings and relief are contrary to the

6    evidence, in violation of applicable legal principles, and should be overturned.

7    **I.    FACTUAL BACKGROUND**

8    TM first began attending school in the District as a kindergartner at Sun Valley School in San

9    Rafael ("Sun Valley") in the 2003-2004 school year.[2]  His kindergarten teacher, Bobbi Nordstrom,

10    closely monitored his progress and development.  Due to concerns, Ms. Nordstrom referred him to

11    a Student Study Team ("SST") to discuss his performance with other educators as well as his mother.

12    An IEP was scheduled for him in May of 2004, and he was provided speech and language services.

13    TM was in Teryl Volkober's class for the 2004-2005 first grade year.  Ms. Volkober carefully

14    monitored his progress, referred concerns related to his reading skills to an SST, and provided him

15    extensive individualized and small group services.  As a result of the SST, special education experts

16    met and chose to assess TM's language arts abilities through tests appropriate to his age, maturity, and

17    academic level.  While TM's scores fell within the average range, at an IEP in the spring of 2005, the

18    District chose to provide him resource specialist services from Frances Dahlstrom, in addition to

19    continued speech and language services from Leigh Klibowitz. Ms. Dahlstrom developed goals for

20    him based upon IEP discussion as well as personal interactions with him.

21    TM had Michelle Giraud as a teacher in his 2005-2006 second grade year.  Ms. Giraud is

22    trained in both special and regular education. Ms. Giraud also provided TM extensive individualized

23

---

24    [1]    Evidentiary references are to the Joint Corrected Administrative Record, filed on January 11,

25    2008, and are indicated simply by number. Where not indicated by the text, witness testimony is
      identified by a parenthetical: Dr. Claudia Wilson (CW), Frances Dahlstrom (FD), Leigh Klibowitz

26    (LK), Michael Buckley (MB), Teryl Volkober (TV), Michelle Giraud (MG), Pam Gunn (PG), Zelda
      Mellor(ZM), Joy Ruppersburg (JR), Craig Garabedian (CG), Kris Stephens (KS), Linda Hoy (LH).

27

28    [2]    TM's general history is documented in the District's exhibits, 2237-2393, and is more
      specifically delineated in the arguments which follow.

1  and small group services.  In the fall of his second grade, additional assessments were performed.

2  Because he was older, additional academic assessments were performed.  Again, TM's test scores did

3  not tend to show a learning disability, but, based upon teacher and parent observations, the IEP team

4  determined that TM qualified for special education services due to a specific learning disability.  They

5  continued his speech and language therapy and doubled his resource specialist time.

6        TM was in a class jointly taught by Nelson and Paula De Blaaw in this 2006-2007 third grade

7  year.  Within the first month, TM's mother withdrew him without notice, and placed him at Star

8  Academy, a school exclusively for children with learning problems.  In May of 2007, TM brought a

9  due process complaint under the IDEA seeking reimbursement for the private school's tuition, and

10  other privately obtained tutoring services.  Hearing was held in June, and in August, the Decision was

11  issued, finding against TM on 13 of his claims, for him on five, and awarding him partial

12  reimbursement for his parent's private placements.

13  **II.    LEGAL STANDARDS**

14      **A.    STANDARD OF REVIEW**

15        On review of a due process claim, "... the court shall receive the records of the administrative

16  proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the

17  preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20

18  U.S.C. § 1415(e)(2).

19

20      The traditional test of findings being binding on the court if supported by substantial
evidence, or even a preponderance of the evidence, *does not apply.* ....  The court, in
recognition of the expertise of the administrative agency, must consider the findings

21  carefully and endeavor to respond to the hearing officer's resolution of each material
issue.  *After such consideration, the court is free to accept or reject the findings in part*

22  *or in whole.*

23  *Ms. S. ex rel. G. v. Vashon Island School Dist.* (9th Cir. 2003) 337 F.3d 1115, 1127, fn. 16 (emphasis

24  added).  Although cast as a motion for summary judgment, review "really amount[s] to a trial *de novo*

25  on a stipulated record."  *Capistrano Unified School Dist. v. Wartenberg By and Through Wartenberg*

26  (9th Cir. 1995) 59 F.3d 884, 891-892.

27      **B.    LEGAL STANDARDS FOR REIMBURSEMENT**

28      [P]arents who ... 'unilaterally change their child's placement ... are entitled to

1    reimbursement *only* if a federal court concludes both that the public placement violated
2    IDEA and that the private school placement was proper under the Act.

3    *Florence County School Dist. Four v. Carter By and Through Carter ("Florence County")* (1993) 510

4 U.S. 7, 15 (emphasis in original). Reimbursement is unavailable where a school provided a free and

5 appropriate public education – "FAPE." *Miller ex rel. Miller v. San Mateo-Foster City Unified Sch.*

6 *Dist.* (N.D. Cal. 2004) 318 F.Supp.2d 851, 862; 34 C.F.R. §300.403(c); Educ. Code § 56175;

7 *Florence County Sch. Dist. 4 v. Carter* (1993) 510 U.S. 7, 15. The FAPE inquiry requires

8 examination, first, whether "the State complied with the procedures set forth in the Act" and, second,

9 whether "the individualized educational program developed through the Act's procedures [was]

10 reasonably calculated to enable the child to receive educational benefits." *Amanda J. ex rel. Annette*

11 *J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 890. "If these requirements are met, the

12 State has complied with the obligations imposed by Congress and the courts can require no more." *Ib.*

13      As explained in *Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v.*

14 *Rowley,* 458 U.S. 176, 188, 200, the IDEA merely assures a "basic floor of opportunity."

15      Congress did not impose upon the States any greater substantive educational standard
16      than would be necessary to make ... access [to public education] meaningful. Indeed,
     Congress expressly "recognize[d] that in many instances the process of providing
17      special education and related services to handicapped children *is not guaranteed to*
     *produce any particular outcome.*" Thus, the intent of the Act was more to open the
18      door of public education to handicapped children on appropriate terms than to
     guarantee any particular level of education once inside.

19 *Rowley, supra,* 458 U.S. at 192 (citation omitted; emphasis added); *Ib.* at 201, n. 23 (focus is on

20 design of program and not specific outcome); *see, e.g., E.S. v. Independent School District* (8th Cir.

21 1997) 135 F.3d 566 (FAPE provided despite failure to meet grade level standards).

22      The District's offer must address a student's unique needs, be reasonably calculated to provide

23 some educational benefit, and comport with the IEP's goals. 20 U.S.C. §§1401(8), 1414(d)(1)(A);

24 Ed. Code §§ 56341.1, 56342, 56345; *Rowley,* 458 U.S. at 181. If these requirements are met, the

25 District has offered FAPE, even if the parents prefer another program, and even if their program would

26 result in greater benefit. *Rowley* at 203-04; *e.g., Gregory K. v. Longview School Dist.* (9th Cir. 1987)

27 811 F.2d 1307, 1314. A school district is neither required to provide a student the best possible

28 educational services, nor to "maximize" a student's potential. *Rowley* at 189-201.

1    In addition, the district holds the prerogative to determine how to provide FAPE. As explained

2    in *Rowley, supra,* 458 U.S. at 207-208:

3

4    In assuring that the requirements of the Act have been met, courts must be careful to
     avoid imposing their view of preferable educational methods upon the States. The
     primary responsibility for formulating the education to be accorded a handicapped

5    child, and for choosing the educational method most suitable to the child's needs, was
     left by the Act to state and local educational agencies in cooperation with the parents

6    or guardian of the child.

7    Finally, "not all procedural violations deny the child a FAPE." *R.B., ex rel. F.B. v. Napa Valley*

8    *Unified School Dist.*(9th Cir. 2007) 496 F.3d 932, 938. "A child is denied a FAPE only when the

9    procedural violation results in the loss of educational opportunity or seriously infringes the parents'

10   opportunity to participate in the IEP formation process." *Ib.*(internal punctuation and citations

11   omitted); *see* 20 U.S.C. §1415(f)(3)(E)(ii). And even if significant errors occur, reimbursement

12   remains subject to equitable limitations. *Miller ex rel. Miller v. San Mateo-Foster City Unified School*

13   *Dist., supra,* 318 F.Supp.2d at 862.

14   **C.    THE LEAST RESTRICTIVE ENVIRONMENT REQUIREMENT**

15   To the maximum extent appropriate, children with disabilities, including children in
     public or private institutions or other care facilities, [should be] educated with children

16   who are not disabled, and special classes, separate schooling, or other removal of
     children with disabilities from the regular educational environment [should] occur[]

17   only when the nature or severity of the disability of a child is such that education in
     regular classes with the use of supplementary aids and services cannot be achieved

18   satisfactorily.

19   20 U.S.C. §1412(a)(5). "This part of the IDEA requires the District to educate [the student] with her

20   nondisabled peers – known as "mainstreaming" here – to the 'greatest extent appropriate.'" *Board*

21   *of Educ. of Tp. High School Dist. No. 211 v. Ross* (7th Cir. 2007) 2007 WL 1374919, 8; *See, e.g.,*

22   *Sacramento City Unified School Dist., Bd. of Educ. v. Rachel H. By and Through Holland* (9th Cir.

23   1994) 14 F.3d 1398, 1404 (defining four-part inquiry for mainstreaming).

24

25   The mainstreaming requirement also limits reimbursement for unilateral placements:
     A private placement is "proper" [for possible reimbursement] if it (1) is "appropriate,"
     i.e., it provides "significant learning" and confers "meaningful benefit," and (2) is

26   provided in the least restrictive educational environment.

27   *Lauren W. ex rel. Jean W. v. Deflaminis* (3d Cir. 2007) 480 F.3d 259, 276; *accord, M.S. ex rel. S.S.*

28   *v. Board of Educ. of the City School Dist. of Yonkers* (2d Cir. 2000) 231 F.3d 96, 105; *but see*

1  *Cleveland Heights-University Heights City Sch. Dist. v. Boss,* 144 F.3d 391, 399-400 (6th Cir.1998)

2  (failure to mainstream not necessarily a bar to reimbursement).

### D.    STATUTE OF LIMITATIONS

IDEA claims are governed by a two-year statute of limitations. Ed. Code §56505(l)("two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request.")  The statute begins to run on the day the parents learn of the pertinent decision. *E.g., Miller v. San Mateo-Foster City Unified School District* (N.D.Cal. 2004) 318 F.Supp.2d 851, 860 (claims accrued when parent's learned of school district decision); *see Leake by Shreve v. Berkeley County Bd. of Educ.* (N.D. W.Va 1997) 965 F.Supp. 838, 846 (claims accrued when parents notified of special education ineligibility); *Ravenswood Elementary School District and Sequoia Union High School District,* Case No. SN 988-97, SEHO 1997-988 ("continuing violations" doctrine not applicable to IDEA).[3]  In this case, Real Party filed his complaint on May 18, 2007 ("Special Education Due Process Complaint Notice," 2167-178), and thus claims arising from actions taken prior to May 18, 2005 are barred.

### III.    THE FACT OF TM'S BENEFIT FROM THE DISTRICT SERVICES PROVES HE WAS PROVIDED A FREE AND APPROPRIATE PUBLIC EDUCATION

While the failure to obtain benefit does not mean FAPE has been denied, where benefit occurs it is strong evidence FAPE was provided.  The preponderance of evidence clearly demonstrated that TM received benefit from the extensive services provided by the District.  Dr. Wilson testified there was "overwhelming" proof that TM received benefit.  1423:2-1424:16; 1346:20-1352:3; 1464:8-1465:3; 1472:10-19.[4]

---

[3]    A true and correct copy of *Ravenswood Elementary School District and Sequoia Union High School District,* Case No. SN 988-97 is located at 1954-1962.

[4]    Dr. Claudia Wilson has a doctorate from the University of California at Berkeley in Education, with an emphasis in mild to moderate disabilities, a bachelor's degree from University of California at Santa Cruz in Linguistics, and a Masters Degree in Applied Linguistics from San Francisco State ("State").  She has taught in the Special Education and English departments at State since 1984.  She usually works as a parent advocate in special education matters and has done community work.
(continued...)

1  Ms. Volkober reported at the end of his first grade year, 2004-2005, that TM "continues to

2  improve in all subject areas," while noting he "struggles" with language arts. Report to Parents – First

3  Grade, Exh. 6, 2256. TM's report cards demonstrates clear progress. Of the 33 language arts

4  assessments, TM received 19 1's indicating he "meets standard, " 12 2's indicating he was "working

5  towards standard," and only two 3's, indicating an "area of concern." *Ib.* at 2253-54. Ms. Volkober

6  affirmed that TM benefitted from her instruction (1055:21-1057:8), and that he progressed in language

7  arts in her class. 1063:16-20, 1028:16-19; 1021:5-21.

8  TM also made substantial progress in second grade. Ms. Giraud reported:

9
10  Travis has matured both academically and socially this year. He has become more of
   an independent worker .... He continues to be good about asking for help when he
   needs it, however, this is less often which is great to see. .... In language arts, Travis
11  continues to be below grade level, but has made progress since the beginning of the
   year. His phonetic spelling has improved as has his recognition of sight words.
12

13  Report to Parents – Second Grade, Exh. 43, 2340. The second grade report card shows significant

14  progress in the 21 language arts test-based evaluations, receiving 15 1's, 4 2's, and only 2 3's. *Ib.* at

15  2338-39.[5] Ms. Giraud affirmed that TM made substantial progress, including language arts. 1532:21-

16  1533:13; 1539:19-24.

17  TM also made substantial progress in his special education work. The speech and language

18  therapist reported that TM met two of his four speech and language goals by his first grade IEP.

19  "Annual Review Summary," 3/8/05, Exh.30 , 2320. This progress continued in second grade, where

20  TM made "steady progress" and met three of his four goals. "IEP Goals and Objectives," 3/8/05, Exh.

21  15, 2317; "Annual Review Summary," 2/2/06, Exh. 46, 2343; "IEP Goals and Objectives," 3/8/05,

22  Exh. 28 at 2317; *accord* 1399:6-1400:6(CW), 1397:24-1341:1(CW). The resource specialist also

23  reported progress in first and second grade. "IEP Goals and Objectives," 3/8/05 , Exh.28, 2316(end

24  of first grade and first two thirds of second grade); "IEP Goals and Objectives," Spring 2006, Exh. 51,

25
─────────────────────
26  [4]    (...continued)
   1331:23-1341:22; 1412:12-25; 1416:12-1420:18; *see* Curriculum Vitae, Exh. V, 2225-28.
27
   [5]    Ms. Giraud explained that a "2" indicates nothing more troubling than a student has not yet
28  mastered but is continuing to work on the task. 1529:1-16(MG).

2371-2373; "Assessment Summary," 2/7/06, Exh. 48, 2348. TM progressed in 1) reading fluency, almost doubling from fifteen words per minute in March to 27 in June; 2) jumping a level in decoding from "far below basic" in March to "below basic" in June; and, 3) in sight word recognition, a 50% increase from March to June. "IEP Goals and Objectives," Spring 2006, Exh. 51, 2371-73 (March 50, June 75).

TM's benefit was also shown by regular promotion from first and second grades. *See* March 11, 2004 IEP, Exh. 15, 2270; 3/8/05 IEP, Exh. 28, 2309; Spring 2006 IEP, Exh. 51, 2356. As stated in *Rowley, supra,* 458 U.S. at 207, n. 28, "... the achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." *Accord Walczak v. Florida Union Free School Dist.* (2d Cir. 1998) 142 F.3d 119, 130.

## IV.    THE DISTRICT PROPERLY ASSESSED TM IN LANGUAGE ARTS IN FIRST GRADE

Contrary to the finding of failure to "assess Student in the areas of Language Arts," for TM's 2004-2005 first grade school year (Legal Conclusion. 10, 1903), the preponderance of evidence demonstrates the District properly assessed TM's language arts skills.

### A.    STATUTE OF LIMITATIONS

As an initial matter, the Decision's finding is based on assessment decisions made in *December of 2004* for purposes of the service decisions made at the *March 8, 2005 IEP,* and thus runs afoul of the two-year limitations period which ended on May 18, 2005. *See* Decision, Factual Conclusion. 12, 1881; *see* section III, B., 2(g, h), at pp. 10-11, below.

### B.    THE DISTRICT'S ASSESSMENTS WERE REASONABLE

#### 1.    Informal/Observational Assessments

Dr. Wilson established that special education assessments take a variety of forms, including reports by teachers and parents, work samples, social success, performance in class, and report card reports. 1358:14-1360:3. Dr. Wilson explained that a teacher's and others views of the student, his view of himself, and how he's doing, are all "of far greater importance" than standardized tests.

1376:25-1377:12. Dr. Wilson found at Sun Valley a "continual monitoring of informal assessments" of TM. *Ib.*; *see* 1375:13-18. The resource specialist, Frances Dahlstrom,[6] confirmed that Sun Valley educators engaged in regular dialogue about serving TM's needs. 276:4-23; 277:23-279:7; 334:3-13. Ms. Dahlstrom recalled she had many conversations with TM's teachers and others at the school about him even before she began offering him services. 334:14-24. Ms. Volkober confirmed she had numerous conversations with TM's parents about his progress. 1021:22-1022:14; 1045:20-22; 1028:16-19. This informal assessment continued through second grade. 1539:9-1539:18(MG).

### 2.    Abundant Formal Assessments

#### a.    Report Card Test Based and Observational Assessments

TM received extensive test-based assessment three times a year through the school's report card. "Report to Parents First Grade," Exh. 6, 2253-2256; *see also* "San Rafael City Schools Kindergarten Report Card," Exh. 4, 2248-51. The report cards include *33* test-based evaluations in language arts! *Ib.* at 2253-2254; 1019:2-25(TV)(test scores). They include Ms. Volkober's comments on TM's language arts performance. *Ib.* at 2256[7]; 1020:1-1021:21(TV). The second grade report cards continued the detailed test-based evaluations in language arts, as well as observations by the TM's second grade teacher. "Report to Parents – Second Grade," Exh. 43, 2338-41; 1528:21-1534:3(MG)(test based). Testimony confirmed that report cards are an important assessment tool.

---

[6]    Frances Dahlstrom has a bachelor of arts degree in communication studies from University of California at Santa Barbara, a multi-subject credential from Dominican University in San Rafael. She has both a level one and level two credentials in mild-to-moderate special education and is close to completing her masters degree from Sonoma State University. She has worked as a resource specialist for the District for five years, with an additional two years of resource specialist work prior to that. 207:11-209:17.

[7]    The Decision disingenuously dismisses these extensive assessments by noting that some categories were "not applicable" in the first two trimesters of the first grade. Factual Finding 15, 1881. However, both of those periods fall outside the two-year statutory period. The only pertinent reporting period, the third, includes the entire set of test based assessments. Moreover, the Decision ignores the numerous language art evaluations that were contained in those two periods, 16 for the first trimester, and 25 in the second trimester. 2248-49. Nor is there any reason to believe that testing in areas not yet taught would have been meaningful. *See* 1528:21-1529:16(MG)("NA" indicates that area was not focus of class instruction).

1357:12-18(TV);1357:12-1359:20(CW).

### b.    AIMS

TM's language arts skills were assessed in the triannual "AIMS" fluency test. 402:23-403:9(FD); 258:10-259:5(FD); "Assessment Summary," F. Dahlstrom, 2/7/06, Exh. 48, 2351.

### c.    Houghton Mifflin Test

Additional language arts assessments were the Houghton Mifflin curriculum assessments used to assign TM to a small group in the "Walk to Read" program.  1014:21-1016:11(TV); "Summary Form," Exhibit 18, 2286-2289.

### d.    Classwork

Classroom work is also an important assessment tool, which is why Ms. Volkober included it in TM's SST referral.  1016:9-1016:11; *see, e.g,* Exh. 18, 2282-2284.

### e.    Classroom Symptoms Checklist And SST Referral

Another assessment was the "Classroom Symptoms Checklist," prepared by Ms. Volkober for TM's SST referral in the fall of his first grade year.[8]  Classroom Symptoms Check List, Exhibit 18, 2280-81; 234:6-16(FD)(identifying Exhibit 18); *see* 234:23-235:21(FD)(SST's are valuable means for gather information regarding a student's performance) This form contains *66* different assessment categories many of which specifically address language arts, and all of which are pertinent to them. *Ib.* In addition, Ms. Volkober prepared a "Student Study Team Referral," 10/15/04, Exhibit 19, 2296, including 14 categories of evaluation plus comments.

### f.    SST

An "SST" – "Student Study Team" – meeting occurred on December 7, 2004 to discuss TM's language arts skills and other issues. *See* "Student Study Team [–] Group Memory Reporting," ("SST report") 12/07/04, Exh. 20, 2297-98.  The SST was attended by TM's first grade teacher, the speech

---

[8]    An SST – "Student Study Team" – provides a forum for a teacher to discuss student concerns with other professionals, here including the principal, the resource specialist, the speech and language therapist, a counselor, the school psychologist, and TM's mother. 576:16-577:1(LK).

1  and language therapist, the resource specialist, his mother, and a school psychologist. *Ib.* The SST

2  assessed Real Party's performance in language arts, discussed and made recommendations to address

3  his concerns. *Ib.*; 229:19-230:13(FD); 234:17-22(FD).

     **g.**    **Post-SST Global Language Assessment – CELF 3 and Test of Phonological Awareness**

6       Pursuant to the SST, an "APT" – "Assessment Planning Team" – comprised of the resource

7  specialist, speech and language therapist, and school psychologist – met within ten days to discuss

8  further assessment of TM. 334:25-337:8 (FD); 340:24-341:7 (FD); *see also* 577:2-579:3(LK), 583:19-

9  21(LK); *see, e.g.,* "Parent Consent for Assessment," 12/17/04, Exh. 21, 2299; "Comprehension &

10  Expression of Spoken Language," 12/17/04, 1/18/05, Exh. 23, 2301. The APT team chose to

11  administer the "CELF" – "Clinical Evaluation of Language Fundamentals" test – and the "TPA" –

12  "Test of Phonological Awareness." 586:9-587:13(LK)(explains CELF); 588:9-18(LK)(explains TPA);

13  "The Phonological Awareness Test[:] Computerized Scoring," 2/17/05, Exhibit 25, 2304-05.

14       Tests were chosen which would assess TM's language arts skills in a manner appropriate to

15  his age and development. 339:17-342:1(FD); 577:2-583:18(LK), 588:9-18(LK); 619:21-621:11(LK);

16  *see* 1353:12-1356:16(CW). The approach was a "global language assessment," administered by the

17  speech and language therapist as assisted by the resource specialist. 577:2-578:4(LK), 588:14-15(LK),

18  620:12-25(LK), 583:7-15(LK). Ms. Dahlstrom explained that assessments should be matched to the

19  student (241:6-16), that assessing children in the first grade is not accurate because of their limited

20  skill levels (239:25-241:16) and that they chose tests that were appropriate for TM's age and

21  development, as opposed to tests with academic focus. 413:22-414:20, 414:21-24, 621:12-

22  622:21(LK); *see* 588:19-589:4(LK)(TM too young to complete decoding section of TPA, but scored

23  for informational purposes); 621:4-11(LK)(same).

     **h.**    **IEP Assessment**

26       An IEP was held regarding Real Party on March 8, 2005 to assess TM's language arts

1  concerns. It was attended by Sun Valley's principal, Julie Harris, Ms. Dahlstrom, Ms. Klibowitz,[9] Ms.

2  Volkober, and TM's mother. IEP 3/8/05, Exh. 28, at 2314. The IEP team reviewed TM's scores on

3  the APT tests. "Annual Review Summary," Leigh Klibowitz, 3/8/05, Exh 30, 2319-20; 585:17-

4  586:8(LK), 589:20-590:7(LK)(TPA Score Report, Exh. 24, discussed at IEP); 342:2-343:3(FD). The

5  IEP team also heard the first grade teacher's informal report (see "General Education Teacher Report,"

6  3/8/05, Exh. 27, 2307; 344:24-345:4(FD)), as well as the report of TM's mother (IEP 3/8/05, Exh.

7  28, 2308), and the speech and language therapist's report. "Annual Review Summary," Leigh

8  Klibowitz, 3/8/05, Exh 30, 2319-20; *see generally* 346:11-19(FD); *see generally* IEP 3/8/05, Exh. 28,

9  2308-2317. Ms. Dahlstrom testified that at the IEP they had a good picture of TM's strengths and

10  weaknesses (252:5-16(FD)), and had ample information to provide TM appropriate services. 252:17-

11  23, 254:13-255:15.

### i.      Post IEP Assessment

13  Following the IEP, further assessments were performed. First, the resource specialist

14  personally worked with and observed TM to determine appropriate goals. 347:17-348:21(FD); 3/8/05

15  IEP, Exh. 28, 2313; *see* "IEP GOALS AND OBJECTIVES," Exh. 28, 2316. While providing services

16  to him, Ms. Dahlstrom continued to assess TM's performance. 265:24-269:3(FD), 271:24-

17  272:7(FD)(continued to work towards TM's success); *see* "IEP GOALS AND OBJECTIVES,"

18  Exh.28, 2316 (noting progress); *see, e.g.,* 272:14-273:5(FD)(TM was making progress); 1539:9-

19  1540:21(MG)(regular consultation regarding TM in second grade).

### C.      THE DISTRICT'S ASSESSMENTS WERE PROPER

22  Dr. Wilson testified that the standardized test assessments were proper. 1358:14-1360:3,

23  1447:1450:18; 1434:8-1435:6 (because of variability in 5-year-old's development very hard to

---

[9]      Leigh Klibowitz, the speech and language therapist, has a Bachelor of Science degree from University of Wisconsin at Milwaukee, a Masters of Science in speech pathology from Marquette University, and both a state license and a clinical certificate of competence in speech pathology. She has worked for five years as speech pathologist, doing assessments, screenings and therapy, three of them at Sun Valley, and also worked for a year doing assessments for the San Francisco Unified School District. 569:25-573:8.

1 | determine learning disability); *see, e.g.*, 1429:21-1431:3(failure to meet first grade standards does not

2 | prove learning disability).  Dr. Wilson took great pains to explain the impropriety of placing too much

3 | emphasis on or to base special education decisions on standardized test scores.  1358:14-1360:3,

4 | 1375:19-1376:24, 1442:22-1444:19, 1452:1-10, 1450:4-18 (no specific test result required for special

5 | education eligibility); 1347:19-1450:4 (no specific tests will identify a specific learning disability);

6 | *accord*, Educ.Code § 56320, 20 U.S.C. §1414(b)(2)(B)(same).  Dr. Wilson testified that for first and

7 | second graders, observation, performance in the classroom, behavioral indicators, and report cards are

8 | better assessment tools than academic standardized testing.  1497:10-1498:12; *accord*, 374:1-

9 | 10(FD)(must consider general education performance, emotional and social development); 636:18-

10 | 637:4(LK)(must consider teacher reports and parent concerns).  TM's own expert, Ms. Ruppersburg

11 | confirmed that the District's first grade assessments were so "very helpful" that she felt no need to do

12 | formal assessments of her own. 870:1-15.[10]

13
14 | **D.    ANY FAILURE TO CONDUCT EVEN MORE ASSESSMENTS WAS WITHOUT CONSEQUENCE**

15 | Dr. Wilson explained determining a student's reading level through testing was not that

16 | important as the effectiveness of interventions depends primarily upon the way a student learns, and

17 | thus the same intervention will often work for a variety of different skill levels. 1446:2-1447:14.  Dr.

18 | Wilson noted that the parents' placement, reached "pretty much the same conclusions" with their

19
20
21

22 | [10]    Ms. Ruppersburg is referring to the supposedly inadequate first grade assessments, since when

23 | she reviewed them on November 2, 2005 (Letter 3/10/07 from J. Ruppersburg to Z. Mellor, Exh. R, 2208), the second grade assessments had not occurred. *See, e.g,* Assessment Planning Team Case

24 | Review Checklist", etc, 11/18/05, 2332-2336; "Assessment Summary," F. Dahlstrom, 2/7/06, 2349(test date of 1/6/06); 903:22-904:4(JR)(school was "obtaining" additional assessments at time

25 | of first meeting); *see* Note 11/29/05 from Z. Mellor to F. Dahlstrom, 2337. She also felt further testing

26 | was not justified in light of the stress it would cause TM.  870:1-15. Ms. Dahlstrom confirmed that testing of weaknesses is stressful for a student (404:3-20(FD), and thus overtesting should be avoided,

27 | particularly as TM was noted for anxiety about his learning issues. *See* 3/8/05 IEP, Exh. 28, 2308. Even TM's mother requested that TM not take the state standardized test in language arts.  Note

28 | 4/18/06 from Z. Mellor to F. Dahlstrom, Exh. 56, 2377; *see* "Star Student Report," Exh. 57, 2378.

assessments, and used the same multi-sensory, eclectic teaching methods. 1386:19-24(CW).[11]

## V. THE DISTRICT PROVIDED AN APPROPRIATE LEVEL OF SPECIAL EDUCATION SERVICES

The Decision's determination that the District had failed to provide sufficient RSP services to TM in the 2004-2005 first grade and 2005-2006 school years (Legal Conclusions. 14 and 24, 1904, 1906-07) is contrary to the preponderance of the evidence and applicable legal standards.

### A. THE ADMINISTRATIVE DECISION CONTRAVENES THE APPLICABLE STATUE OF LIMITATIONS

The Decision finding inadequate provision of resource specialist services is based upon the decision *at the March 8, 2005 IEP* about the provision of RSP services. As TM filed his complaint on May 18, 2007, such events lie well beyond the applicable limitations period. Dr. Wilson testified that as a whole the services provided by the District were reasonably calculated to and did provide TM benefit. 1343:22-1345:12

### B. SERVICES IN THE GENERAL EDUCATION ENVIRONMENT

The Decision entirely ignored the extensive individualized one-on-one and small group work provided to TM in the general education setting. There was no evidence presented to show that the individualized and small group attention provided in the general education setting was any less significant, important or appropriate than services provided through the resource specialist. Instead, Dr. Wilson confirmed that the services in the first, second and third grade general education settings were in themselves reasonably calculated to provide educational benefit. 1345:13-1353:11(first grade); 1372:5-1374:7; 1403:13-1404:18 (third grade).

#### 1. Services in the First Grade General Education Classroom

---

[11]    The only difference Dr. Wilson noted was that Star reported some emotional issues, which had not been observed when TM was at Sun Valley, and the Star teacher failed to comment on language arts issues in her comments.  Dr. Wilson also noted that Star reached an erroneous conclusion regarding TM's expressive capabilities – sentence formulation skills – inappropriately based solely upon anomalous result on one standardized subtext.  1389:19-1397:23(CW).

TM's first grade teacher, Ms. Volkober, testified that TM received a lot of individual attention from herself and others in the general education setting. 1059:20-1060:4. She explained numerous steps she took to provide TM educational benefit (*see generally* 1005:3-1006:19): 1) she sat him next to her, and would observe him to make sure he was proceeding with tasks (1008:6-12); 2) she repeated assignments for him, 1007:9-20); 3) she would help him when he got stuck, *ib.*; 3) she used a system where students worked together and provided each other assistance (1007:22-1008:5); 4) she provided additional time for completion of tasks ("General Education Teacher Report," March 8, 2005, Exh. 27, 2307); 5) she provided him shortened assignments (*ib.*); 6) she provided him frequent breaks, (3/8/05 IEP, Exhibit 28, 2312); 7) she gave him reduced paper and pencil tasks (*ib.*); and 8) she provided him repeated review and drill. *Ib.*[12]

Ms. Volkober was assisted by parents and she would choose the best-suited parent to assist TM. 1008:13-1009:16(TV), 1039:12-23(TV)(parents would visit about once a week). In addition, an assistant, Anne Marie Montelotto, would visit a couple of mornings a week and would help TM, usually with his "journal writing" 1012:19-1013:15(TV). Ms. Volkober's general education class was visited in the afternoon by Jen Suthern, who would work with TM on reading, in a manner coordinated with the language arts work in the core curriculum. 1009:17-1012:8(TV). In addition, two K-1 teachers who would regularly provide individualized and small group instruction to TM through the "Walk to Read" program, another supplemental program to the core curriculum reading program. 1013:16-1014:20, 1005:16-1006:19, 1035:25-1038:2, 1018:8-1039:1; *see* March 8, 2005 IEP, Exh. 28, at 18, and SST, Exh. 20; *see* 328:25-329:17(FD). Through this program, TM received instruction at his level in a group of no more than five or six children. 1013:16-1014:20(TV); 329:6-24(FD).

---

[12]    Teryl Volkober has a Bachelor of Science degree in Education from the University of Oregon, and has taken numerous post-graduate course in reading , language arts and science at Lewis and Clark College, Portland State University, and California State University at Hayward. She has a basic teaching credential from Oregon, and a multi-subject credential from California. She is also "CLAD" – "Cross-cultural Language and Academic Development" – certified, which requires coursework addressed to teaching English learners, including work in teaching reading and writing. She taught second, third and fourth grades for 17 years in Oregon before moving to California, where she had taught second and third grades for 12 years by the time she had TM in her class. 997:23-1002:13. TM's mother testified Ms. Volkober was a well-rounded, experienced teacher. 1002:3-1003:6.

TM's group assignment was based on various language arts assessments (1047:4-1048:2(TV)), and used materials specifically matched to his skill level. 1039:24-1041:13(TV).

At this time, Ms. Volkober had 30 years of teaching experience, and felt that working in this manner in small groups was helpful, as well as individual assistance. 1006:20-1007:8. Ms. Dahlstrom confirmed that this individualized and small group instruction was an excellent approach for assisting students with language arts difficulties. 329:25-330:5(FD).[13]

## 2.    Services in the Second Grade General Education Classroom

Arising from Sun Valley's careful, considered decisions regarding class assignments matching student's needs to teachers,[14] TM was placed in second grade class taught by Michelle Giraud, who has extensive experience and training in special education, including a special education credential and four years of experience working as a resource specialist for Sun Valley.[15]

Ms. Giraud testified that she used her knowledge and experience in special education to provide assistance appropriate to TM. 1531:15-22. Ms. Giraud implemented a number of accommodations calculated to provide TM educational benefit: 1) she sat TM near an adult, either the teacher or a parent, for assistance (1523:8-1524:4); 2) she sat him near the front of the class (1528:2-15); 3) she assigned him to peer or buddy for assistance (1524:5-13); 4) she repeated directions for TM (1524:14-16); 5) she provided TM with opportunities to do small group work, assisted by herself

---

[13]    In addition to extensive individualized attention, Ms. Volkober also enlisted the contribution of her colleagues through referral of TM to an SST, as noted above. 1003:12-1005:2(TV); *see* 1016:3-1017:7(TV)(discusses report of SST meeting).

[14]    Sun Valley educators explained that the school meets in the spring to discuss the most appropriate classroom assignment for each student, based upon the student's abilities, personality, discipline issues, including whether or not the student was receiving resource specialist services or speech and language therapy. 1026:5-1033:7(TV); 415:15-416:9(FD). TM's mother found Ms. Giraud to be an "excellent teacher." 1263:15-1264:11.

[15]    Michele Giraud has a Bachelor of Science degree in Human Development from University of California at Davis, and a Masters degree in Curriculum and Instruction, a mild to moderate special education credential, and a multi-subject general education credential from University of San Francisco. She worked for four years as a Resource Specialist and five years as a second and third grade teacher at Sun Valley. 1512:7-1517:1.

or a parent volunteer. 1523:8-1526:18.

Ms. Giraud provided a differentiated reading program to students, including TM. TM worked in small groups or received one-on-one attention as part of his reading instruction. 1526:3-18. Ms. Giraud's class had several parent volunteers who would provide small group assistance, with Ms. Giraud monitoring their performance. 1525:6-1526:2.

Dr. Wilson described TM's second grade general education class as a "very special environment," in light of Ms. Giraud RSP training, the individual and small group instruction TM received, and the teaching programs and accommodations provided. 1370:25-1371:18. She testified that the second grade environment alone was reasonably calculated to provide TM educational benefit, as proven by the progress he made there. 1372:5-1374:7.[16]

### 3.   The Determination Of The Level Of Resource Specialist Services Was Reasonable

#### a.   No fixed formula

The consistent and uncontradicted testimony at hearing was that there is no fixed formula by which the appropriate level of resource specialist services can be determined. 349:24-350:7(FD); 1054:6-9(TV). TM's experts agreed that determining the appropriate amount of time was merely an "educated guess" with no certainty of success. 928:7-12(JR); 747:23-748:17(CG).

#### b.   The Constraints of the Mainstreaming Requirement

Evidence also demonstrated that it is necessary to balance RSP time against the legal requirement of keeping an learning disabled child in the mainstream classroom to the maximum extent possible. 250:12-251:21(FD); *see* 349:10-23(FD)(balancing necessary to fulfill least restrictive environment requirements); 1055:14-17(TV)(LRE requirement considered in determining level of RSP time); 1053:8-1054:5(TV). Such sensitivity was particularly appropriate where the general education classroom offered TM such excellent programs for children with special education needs.

---

[16]   As the Decision found no purported fault with level of services offered and provided in the 2006-2007 third grade year, it is not discussed here, although it offered extensive individualized and appropriate services which were more than reasonably calculated to provide benefit as well.

250:12-251:12(FD); *e.g.,* 348:24-349:9(FD)(decoding was part of the general education curriculum), 327:5-13(FD)(practicing sights words and playing word games" and "touching and tracing letters to enforce letter recognition" are included within the general education setting); *see* Student Study Team Group Reporting 4/27/04, Exh. 11, 2263 (touching and tracing letters recommended for TM); 912:12-913:3(JR)(reading is part of second grade curriculum).

### c.    RSP Time Should Be Provided In Increments

Ms. Dahlstrom explained that TM was too young in first grade to determine if he had a learning disability (252:24-253:14, 256:16-21[17]), and that rather than debating that academic question, they provided him resource specialist services under his speech and language eligibility in order to address his reported needs. 252:24-254:12; 623:14-22; *see* 3/8/05 IEP, Exhibit 28, 2313.

Ms. Dahlstrom explained that the IEP chose to provide TM twice weekly RSP services because they believed it would meet his needs. 244:22-245:2; 249:5-24.[18] Ms. Dahlstrom noted that the level of services reflects the fact that provision of services is an ongoing process, and they were all professionals working to provide TM assistance. 244:15-245:2.[19] In fact, the empirical evidence showed TM's sister A, who had similar problems (256:22-258:9(FD), had received the same twice a week, 30 minute level of service (1096:19-1097:13(ZM)), from the same Ms. Dahlstrom (257:17-20(FD)), did "very well" with it, and is now getting straight A's! 1240:9-1241:8(ZM).

Ms. Dahlstrom explained that given Sun Valley's particularly strong general education environment, the fact that all of TM's teachers were working hard to provide him benefit, as well as TM's developmental level and the least restrictive environment requirement, it was important to try the designated level of services before making adjustments. 401:10-402:6, 307:25-308:16. Dr.

---

[17]    Ms. Dahlstrom explained that academic assessments were performed the following year when they were more appropriate developmentally. 255:16-256:15.

[18]    Of course, at the same time, TM was receiving speech and language therapy twice a week as well, which also removed him from the regular classroom. 3/8/05 IEP, Exhibit 28, 2311.

[19]    Because resource specialist time causes a child to miss classroom instruction, Ms. Volkober and Ms. Giraud made a point of structuring class time, to make sure that students who were leaving the class for services was most appropriate. 1025:15-1026:4(TV); 1534:4-1535:5(MG).

1   Wilson testified that there are a variety of ways to alter interventions aside from increasing time, and

2   that it is essential to keep the least restrictive environment requirement in mind before increasing the

3   amount of resource specialist time. 1499:17-1500:23, 1454:15-23, 1458:25-59:12. Ms. Dahlstrom

4   explained that it is best to adjust the level of services over time. 349:24-350:7(FD); *see* 928:7-

5   20(JR)(the most appropriate level of service can change over time).

6       Ms. Dahlstrom eventually recommended increasing TM's services to four times per week

7   based on TM's assessments and other information and based upon her experience working with him.

8   306:4-19(FD). Ms. Dahlstrom affirmed this increase was also a "judgment call," which she discussed

9   the issue with other members of the IEP team. 306:20-307:6. This process reflected their preference

10   to increase time incrementally based on the student's progress in light of the least restrictive

11   environment requirement. 307:25-308:21(FD). At the same time, Ms. Dahlstrom affirmed that even

12   though she subsequently recommended increasing TM's resource time, that she believed the initial

13   allocation of two times per week was appropriate. 251:15-252:4.

## VI.   THE DISTRICT DID NOT DENY REAL PARTY FAPE BY FAILING TO STATE SPECIFIC GOALS FOR SPELLING AND WRITING

16       The Administrative Decision's finding that the District failed to provide TM FAPE in the years

17   2004-2005, 2005-2006 and 2006-2007 through a failure to specify goals in writing and spelling is

18   unsupportable. Legal Conclusions. 13, 1904; 23, 1906; 35, 1908. There was a failure of proof that

19   the failure to include these goals was error, significant, or deprived TM of a program reasonably

20   calculated to provide him educational benefit.

21       As an initial matter, the claim has insurmountable legal problems. First, it seeks to interfere

22   with the District's exclusive right to determine the "formulation" of its services.

23

24       Second, the claim is barred by the two-year statute of limitations. It is untimely as to the 2004-

25   2005 school year as the decisions made regarding provisions of services all preceded May 18, 2005.

26   And to the extent it challenges the March 8, 2005 IEP, which was in effect through the spring of TM's

27   second grade year, that also clearly falls beyond the statutory period.

28       And as for the spring 2006 IEP, TM's special education expert personally attended TM's IEP

and approved of its proposals, including the continued absence of any spelling or writing goals![20] Ms. Ruppersburg's approval of services without spelling or writing goals is consistent with her tutoring services for which there was no evidence of any spelling or writing goals.

In addition to TM's expert, *four* District employees with post-graduate special education training, approved the spring 2006 IEP for TM despite its lack of goals in spelling and writing: 1) Pam Gunn, the special education program director for the District;[21] 2) Frances Dahlstrom, the resource specialist (*see* fn. 6); 3) Michelle Giraud, TM's second grade general education teacher and former resource specialist (*see* fn. 9); 4) Leigh Klibowitz, the speech and language therapist (*see* fn. 15); as well as 5) Michael Buckley, the school psychologist.[22] *See* IEP Spring 2006, Exh. 51, 2365, 2369-71.

Ms. Dahlstrom explained that she put together recommended goals for TM based upon both the discussion at TM's IEP meetings from his teachers, his speech and language therapist, the principal, and his parents, as well as upon her personal observations of TM. 248:16-250:5 (FD); *see* 259:6-18(FD); 347:17-348:21(Resource Specialist developed March 8, 2005 IEP goals for TM after

---

[20]    Exhibit 51 at 21; 914:14-915:6(Ruppersburg attended IEP as a paid advocate on behalf of TM); 919:19-920:16(as an advocate provided information regarding TM to IEP team and to provide support and explanation to TM's mother); 922:5-9(Ruppersburg in fact provided that support to TM's mother); 925:5-18(ZM signed her consent to those services); 925:19-926:1(Ruppersburg attended as TM's mother's advocate and understood what services were being offered); 925:2-928:6(Ruppersburg acknowledges agreement to IEP); *see* 602:17-603:7(LK)(Ruppersburg did not voice any objection to the IEP plan and goals); 1629:13-1630:11(PG)("everyone" at meeting agreed to IEP); *see* Pre-Hearing Conference Statement, 6/27/07, 2089(designating Ruppersburg as special education expert); 883:19-24(Ruppersberg professes to be expert).

[21]    Pam Gunn holds a bachelor's degree in child development, and a masters degree in special education. She has three credentials, in special education, multiple subjects, and administration, and a resource specialist certificate. She has worked as a general education teacher, a special day class special education teacher, a resource specialist, a program specialist, and is current the special education program manager for the District. 1620:14-1622:17.

[22]    Michael Buckley has a Bachelor's degree in public administrative and a Masters degree in educational counseling from the University of Southern California. He has completed a four-year program in student marriage and family therapy, school counseling and school psychology at San Francisco State. He is a licensed educational psychologist, and holds credential as a school counselor and school psychologist. He has worked as a school psychologist for fifteen years, seven for the District. 125:5-128:25

1  meeting and working with him). At his March 8 2005, Ms. Dahlstrom established *five goals* for TM

2  in sight word reading, a blending of sounds into words, sounding out letter combinations, reading of

3  basic compound words, and reading fluency rate. "IEP Goals and Objections," March 8, 2005,

4  Exhibit 28; *see* 258:10-259:5, 261:19-264:13. TM's argument also ignores the fact that the basis for

5  providing TM special education services in the spring of 2005 was not identified as spelling or writing

6  issues , but was based upon decoding issues, frustration and keeping up in language arts. 1027:9-

7  1028:15(TV); 345:25-347:13(FD); IEP, March 8, 2005, Exhibit 28, 2313.

8      As she worked with him, Ms. Dahlstrom continued to believe that his goals were appropriate.

9  272:14-273:5. TM's second grade teacher and trained special educator, Ms. Giraud confirmed that

10  services provided TM were reasonably calculated to provide educational benefit. 1535:2-10(MG);

11  1538:10-1539:8(MG). Dr. Wilson confirmed that the goals set for TM in both his March 8, 2005 IEP,

12  as well as his March 7, 2006 IEP, were appropriate to address his areas of concern, and consistent

13  showed that progress was being made. 1379:13-1383:9, 1343:22-1347:10, 1353:2-11, 1370:14-24,

14  1464:8-1465:3, 1469:10-19, 1493:19-24.

15      TM also failed to establish that TM was eligible for special education services in spelling and

16  writing. Dr. Wilson, and Julie Harris, Sun Valley's principal, affirmed that a student may have areas

17  of concern that do not qualify him for special education. 99:19-100:10(JH)(student must meet

18  eligibility requirements to receive special education); 1431:18-1432:12(CW)(IEP addresses special

19  education needs, not necessarily all needs); 1430:10-1431:3(CW)(most first graders do not meet

20  standards at end of first grade year); 1434:8-1435:6(CW)(concerns and issues identified in SST did

21  not prove learning disability); 1357:19-1358:6(CW)(bottom third ranking in class does not

22  automatically trigger special education assessment).

23      Most importantly, a failure to articulate goals from the resource specialist does not mean that

24  the student was not receiving instruction in those areas from San Rafael. In fact, both Ms. Volkober

25  and Ms. Giraud explained that basic language arts skills, specifically spelling and writing, were part

26  of the regular curriculum as well as the supplemental curriculums, as demonstrated by TM's first and

27  second grade report cards which contain specific evaluations of writing and spelling. *See* Report to

28

1 | Parents – First Grade, Exh. 6, 2253-56; Report to Parents – Second Grade, Exh. 43, 2338-2340;
2 | 1018:14-1019:1(TV)(reading and writing were big part of 1st grade core curriculum); 1526:19-
3 | 1528:1(MG); 1656:13-1658:14.

4
5 | **VII. THE DESIGNATION OF SPEECH AND LANGUAGE SERVICES GIVES RISE TO NO CLAIM**

6 | The determination of a failure to properly specify speech and language services in 2004-2005
7 | is meritless, contrary to the evidence, and time barred. Decision, Legal Conclusion. 16, 1904-05.

8 | This claim is barred by the statute of limitations as it is based on entries on an IEP form which
9 | occurred in May of 2004, a year beyond the applicable two-year limitations period. *Ib.*; *see* IEP
10 | 5/11/04, Exh. 15, 2273.[23] Moreover, TM's mother admitted she fully understood that TM received
11 | speech and language services outside of the general education classroom. 1284:6-1285:9. In addition,
12 | the finding is wrong, incorrectly finding that neither of the direct or consult services boxes was
13 | checked when they were! IEP 5/11/04, Exh. 15, 2273.

14
15 | Moreover, the indication of services was entirely correct! Ms. Klibowitz confirmed that speech
16 | and language services were provided both inside – the consultive services[24] – and outside the
17 | classroom – direct speech and language therapy. 609:20-610:9(LK); 613:8-21(LK); 640:11-643:12;
18 | 608:20-609:5; *see* 1397:24-1401:1(CW)(IEP properly indicated that services both inside and outside
the general education classroom).

19
20 | In addition, the IEP clearly specified the percentage of time TM would receive services outside
21 | his classroom for his speech and language and resource specialist time. IEP 5/11/04, Exhibit 15, 2272;
22 | 633:15-635:25(LK), 629:19-631:16(LK)(2% corresponds to one 30 minute session a week); 1397:24-
23 | 1399:2(CW)(IEP appropriately indicated provision of speech and language services.) Ms. Klibowitz
24 | explained there was no confusion regarding where her services were to be provided (629:23-631:15,

25

---

26 | [23] That IEP was superceded by the March 8, 2005 IEP (Exh. 28, 2308-2317) which also lies
27 | beyond the statutory period!

28 | [24] "Consultation" refers to the therapist's consultation with the general education teacher and to
the therapists observations of the student both of which occur in the classroom. 630:17-631:2(LK).

632:15-633:22) and that she was always happy to answer any questions that arose.  632:2-14.  Finally, this claim is inconsequential, since TM made great progress in speech and language.  *See* Section II, *supra.*

## VIII.   TM FAILED TO PROVE HE QUALIFIED FOR ESY

The determination that the District failed to provide FAPE by not requiring TM attend extended school year ("ESY") is unsupported by the evidence.  *See* Legal Conclusions. 28 and 29, 1907.  No witness testified that the failure to require ESY denied TM FAPE, would be required pursuant to the legal standard for such services, or would have complied with the least restrictive requirements of the IDEA.  The most striking failure of TM's claim here is that one of TM's experts, Ms. Ruppersberg, personally attended the spring 2006 IEP and approved of the decision not to offer ESY.[25]  Even at hearing, Ms. Ruppersburg, admitted that she could not say if summer school would have been appropriate for TM (961:7-962:5) and admitted that she saw TM less frequently over that summer due to his parents' one-month trip. 969:16-970:7, 872:24-873:11, *compare* 872:10-23(Ruppersburg saw TM twice a week in first half of 2006).  TM's other expert Mr. Garabedian also refused to testify that TM qualified for ESY.  784:18-785:12(CG).

In addition, the spring 2006 IEP meeting was attended by *four* special education experts from the District: Ms. Dahlstrom, the resource specialist, Ms. Giraud, TM's second grade teacher and the former resource specialist for Sun Valley, Leigh Klibowitz, the speech and language therapist, and Pam Gunn, the program director of special education for the District.  These experts, along with TM's own expert and advocate, determined that TM did not require, or fulfill the requirements for ESY in the summer of 2006.  *See*, fns. 6, 9, 15, and 21, above; 1627:16-1628:22(PG)(ESY discussed and determined not appropriate under standard); *see* IEP Spring 2006, Exhibit 51, 2359).  TM failed to show that ESY decision was error or a denial of FAPE.

//

---

[25]      Ms. Ruppersberg's participation and approval of the spring 2006 IEP program is detailed in fn 20.  *See also* 942:8-12(Ruppersberg attended IEP which found TM did not need ESY); 957:16-958:10(same); *see* 959:17-961:5(Ruppersberg did not personally raise ESY despite awareness).

**IX.    REIMBURSEMENT IS NOT PROPER BECAUSE TM'S UNILATERAL PLACEMENTS VIOLATED THE MAINSTREAM REQUIREMENT AND WERE OTHERWISE INAPPROPRIATE**

One commonality of TM's unilateral placements is their violation of the IDEA's "mainstreaming" requirement. Star Academy, TM's third grade placement, is composed exclusively of students with "learning differences." Star Academy Web Pages, Exh. R, at 2212. It is also tiny, with 40 students spread over 12 grades. *Ib.* Such a setting is inappropriate for the highly social TM (1366:5-1367:14(CW); 1521:22-1524:7-13(MG)[26]), and TM's mother admitted he wanted to return to Sun Valley. 1319:7-25.[27] As for Linda Mood Bell, TM's expert testified "it's probably the most restrictive any environment can be" as a student has no peer interaction. 939:8-23(JR).[28] Ms. Ruppersburg's one-on-one tutoring services were also inherently segregative. *See* 872:3-873:11(JR).

**X.    CONCLUSION**

For the foregoing reasons, the Decision's limited findings against the District should be overturned and all claims for reimbursement denied.

Dated: January 31, 2008                         Respectfully submitted,

                                                RUIZ & SPEROW

                                                By:

                                                    David E. Lyon
                                                Attorneys for Appellant/Cross-Respondent
                                                San Rafael City Schools

---

[26]    Ms. Ruppersburg affirmed it was important for TM to be with other students his age. 981:21-983:2(JR); 939:24-941:2(JR).

[27]    Dr. Wilson noted as one of the benefits of mainstreaming that TM's ability at Sun Valley to help his general education classmates in math, one of his strengths, was a great opportunity for him. 1374:12-1375:12

[28]    Ms. Ruppersburg testified that Linda Mood Bell materials were inappropriate for TM. 935:5-936:12(JR); 880:21-881:20(JR)