CELIA M. RUIZ, SBN 87671
DAVID E. LYON, SBN 133065
OKHEE SHIM, SBN 240998
RUIZ & SPEROW, LLP
2000 Powell Street, Suite 1655
Emeryville, CA 94608
Telephone: 510-594-7980
Fax: 510-594-7988

Attorneys for Plaintiff
SAN RAFAEL CITY SCHOOLS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN RAFAEL CITY SCHOOLS<br><br>    Plaintiff,<br><br>v.<br><br>OFFICE OF ADMINISTRATIVE HEARINGS,<br><br>    Defendant.<br>_____<br><br>Related Case:<br><br>T.M., a minor,<br><br>    Plaintiff,<br><br>v.<br><br>SAN RAFAEL CITY SCHOOLS,<br><br>    Defendant<br>_____ | Case No. C07-4702 WHA<br>Related Case No. C07-5751 WHA<br><br><br><br><br><br><br><br><br><br><br><br><br><br>Date:   March 6, 2008<br>Time:   08:00 a.m.<br>Location: Courtroom 9, 19th Floor<br>Hon. William H. Alsup |

**PLAINTIFF/CROSS-DEFENDANT
SAN RAFAEL CITY SCHOOLS'
REPLY BRIEF**

# TABLE OF CONTENTS

Page No.

Table of Contents ................................................................. i

Table of Authorities .............................................................. ii

1.  STANDARD OF REVIEW ................................................. 1

2.  STATUTE OF LIMITATIONS ............................................. 2

3.  THE LEAST RESTRICTIVE ENVIRONMENT ................................ 3

4.  TM IS UNABLE TO ADDRESS ANY OF THE FACTUAL REASONS WHY THE
    DECISION MUST BE OVERTURNED. ....................................... 6

5.  TM'S FAILURE TO IDENTIFY EVIDENCE HE BELIEVES SUPPORTIVE OF THE
    DECISION REQUIRES GRANTING OF THE DISTRICT'S MOTION. ............... 7

# TABLE OF AUTHORITIES

**Cases** — Page Nos.

*Amanda J. ex rel. Annette J. v. Clark County School Dist.*
(9th Cir. 2001) 267 F.3d 877 .......................... 1

*Katherine G. ex rel. Cynthia G. v. Kentfield Sch. Dist.*
(N.D.Cal.2003) 261 F.Supp.2d 1159 ................... 1

*M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers ("M.S.")*
(2d Cir. 2000) 231 F.3d 96 ........................... 3

*Ms. S. ex rel. G. v. Vashon Island School Dist. ("Ms. S.")*
(9th Cir. 2003) 337 F.3d 1115 ........................ 1

*R.B., ex rel. F.B. v. Napa Valley Unified School Dist.*
(9th Cir. 2007) 496 F.3d 932 ......................... 1

*Ravenswood Elementary School District and Sequoia Union High School District*
Case No. SN 988-97, SEHO 1997-988 .................. 3

**Statutes, Codes**

20 United States Code
§ 1415(e)(2) ......................................... 1

Hawaii Statutes
§ 302A-443(a)(2) .................................... 3

Real Party TM ("TM") fails to adduce a scrap of evidence in support of his claims, and thus fails to provide the court any grounds for sustaining the underlying administrative decision ("decision") limited findings against San Rafael City Schools ("the District"). In addition, TM mistakes the proper standard of review, proper application of the statute of limitations and other important legal principals. Based on the extensive and unrebutted evidence identified in the District's moving papers, as well as proper application of legal principals, the Decisions findings against the District must be overturned.

## 1. STANDARD OF REVIEW

As explained in the District's Brief in Opposition to TM's appeal ("District Opposition" at 6:15-28), TM's assertion that the Decision should be reviewed under a "clear error" standard is contradicted by his own authority, which explains that is only a *federal district court's* factual findings that are reviewed by *federal appeals court* under the highly deferential "clear error" standard. *Amanda J. ex rel. Annette J. v. Clark County School Dist.* (9th Cir. 2001) 267 F.3d 877, 887-889. Instead, as set forth in the District's opening brief (2:13-26), the district court on review of an *administrative decision*, as is happening here, must reach its own conclusion as to where the preponderance of the evidence lies. 20 U.S.C. § 1415(e)(2); *Ms. S. ex rel. G. v. Vashon Island School Dist.* ("*Ms. S.*")(9th Cir. 2003) 337 F.3d 1115, 1127.

Moreover, the only deference due the administrative decision is to respond to those administrative which are thorough and careful, but not to abdicate independent confirmation. *Ms. S.*, 337 F.3d at 1127.

Finally, courts explain that no deference at all is due those portions of the administrative decision which simply ignore testimony and evidence. *R.B., ex rel. F.B. v. Napa Valley Unified School Dist.* (9th Cir. 2007) 496 F.3d 932, 943 (court independently reviews evidence ignored by administrative judge); *Katherine G. ex rel. Cynthia G. v. Kentfield Sch. Dist.*, (N.D.Cal.2003) 261 F.Supp.2d 1159, 1175 (no deference due to administrative decision which ignored witness testimony). Those points challenged by the District are not entitled to deference, as those findings are neither thorough nor careful, blithely bulldozing over the statute of limitations, ignoring entire swathes of District evidence, and reaching conclusions which are internally contradictory, contrary to admissions

by TM's own experts, and against not only the preponderance but the overwhelming weight of the evidence.

The District has identified the manifest problems with the Decision's findings in its moving papers, as well as identifying the evidence requiring reversal of those findings. TM refuses to, and would in fact, be unable to, identify a preponderance of evidence in support of the Decision. As the District has already identified evidence sufficient to overturn the Decision in its moving papers, it's appeal should be granted.

## 2. STATUTE OF LIMITATIONS

TM fails to address the proper application of the statute of limitations as set forth in the District's moving papers – namely, that the statute begins to run at the time the student's parents learn of the decision which they wish to challenge. As noted by the authority in the District's opening brief, that application of the statute of limitations is far from "novel" – it is the standard rule in federal court.

It is TM and the Hearing Officer that seek to create a bizarre and nonsensical reading of the statute of limitations. For example, they attempt to avoid the bar to their untimely objection to the assessment planning and implementation decisions made from December 2004 through March 8, 2005 by pretending that they are addressing assessment failures made after May 18, 2005. But TM identifies no assessment decisions being made at that time. Instead, the pertinent assessment decisions had been made, implemented and embodied into service decisions and annual goals at the March 8, 2005 IEP. TM's mother had already not only failed to object but had consented to those decisions. The statute began to run on those decisions at the time TM's parents learned of them at least by the time of the IEP.

Nothing new happened on May 18, 2005. Instead, the only significance of that date is that *two years later*, TM would file his complaint. The suggestion that new assessment duties are retroactively reignited based upon an unanticipated future due process complaint makes no sense at all. Using TM's logic, TM could file a due process complaint on March 9, 2007, two years and a day after the March 8, 2005 IEP, and thereby create a brand new obligation, one day after the IEP, to plan, conduct and implement another round of assessments. The District would thus have a continual and never

ending duties to revisit every IEP issue for every student every single day.

Nor is the statute of limitations a mere technical trap. As explained by the courts, the purpose of the statute is to ensure that true educational concerns are addressed promptly, in light of the ongoing education of a child. *See, e.g., Ravenswood Elementary School District and Sequoia Union High School District*, Case No. SN 988-97, SEHO 1997-988 (a true and correct copy of which is attached at 1954-1962).[1] Of course, the statute also serves to protect school districts by setting some outer limits upon the lure of historical revisionism for purposes of obtaining public funding of unilateral private placements.

### 3. THE LEAST RESTRICTIVE ENVIRONMENT

TM seeks to excuse the inappropriately restrictive nature of his parent's private placement choices by reiterating the findings of authorities identified by the District in its moving papers, and emphasizing that such failure does not necessarily bar reimbursement. TM cites District authority confirming the central point:

> IDEA's requirement that an appropriate education be in the mainstream to the extent possible .. remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate...

*M.S. ex rel. S.S. v. Board of Educ. of the City School Dist. of the City of Yonkers* ("*M.S.*") (2d Cir. 2000) 231 F.3d 96, 105 (emphasis added).[2]

TM does nothing to show that his highly restrictive private placements were somehow appropriate for him. In fact, the impropriety for TM of a highly restrictive environment is no mere abstraction. The unrebutted evidence demonstrated that TM is a highly social, bright student who had many friends. 1366:5-1367:14(CW); 1521:22-1524:7-13(MG). The unrebutted evidence demonstrated that TM particularly enjoyed assisting his non-disabled peers in mathematics, one of his strengths.

---

[1] California's two year statute of limitations is generous. Hawaii, for example, has a *90 day* window for reimbursement claims. Hawaii Statutes § 302A-443(a)(2). Two years should be more than enough time for a parent to pursue any proper claims, particularly in light of the ongoing education of the child.

[2] While TM objects that the 9th Circuit has not squarely addressed this issue, he identifies no reason to think that the 9th Circuit would reach a different conclusion than the 2d Circuit in *M.S.*

1522:3-1523:4(MG); 1374:12-1375:12(CW). The unrebutted evidence demonstrated that mainstreaming provides valuable benefits to the student himself as well as his classmates. 1585:16-1587:7(SP); 1364:10-1366:4(CW). The unrebutted evidence was that TM was not happy at Star Academy and wished to returned to Sun Valley. 1197:18-1198:13(ZM). And the unrebutted evidence was that TM demonstrated behavior problems at Star Academy which had never been noted at Sun Valley. "Star Academy Report Card – 2006-2007," Exh. L., 2202 ("April: .... He is becoming more argumentative when given constructive criticism. June: .... We would like to see improvement in his ability to regulate his emotion.") ; *see also* "Report Card "Lips/Seeing Stars", dated 6/07, Exh. Q, 2207(""Focus continues to be an area of concern"); 1390:13-21(CW)(noting sudden appearance of behavior issues at Star Academy).

TM also declines to address his own expert's testimony that the highly restrictive nature of Lindamood Bell, as well as the nature of its materials, was inappropriate for TM.[3]

Nor did TM demonstrate substantial progress while at Star. For example, at the end of his year there, Star reported that TM continued to score below first grade level in fluency, and showed no improvement over the course of the entire year. Thus, TM's own exhibit, "Annual Report and Assessment Summary 6/15/2007 ("Star Year End Report"), Exh U, 2216, reported that TM performed below first grade level in reading rate and accuracy – "all the same as previous testing." That report explained:

> The Gray Oral Reading Test-4 provides a measure of reading fluency as a composite of reading rate and accuracy. .... Travis performed at the <1.0 grade level in Rate and <1.0 grade level in Accuracy, which combine to produce a Fluency score of <1.0 grade level (all the same as previous testing). His scores at <1st percentile (Standard Score 1) indicate extreme weakness in reading in context.[4]

---

[3] District Brief at 23:1-28. (Note: the District's reference in this section to Ms. Rupperberg's admission that it was important for TM to be with other children his age should refer to 881:21-883:2, instead of 981:21-983:2. Ms. Ruppersberg then expresses surprise at learning how small Star Academy is at 939:24-941:11(JR).)

[4] These test reports dramatically contradict the rosy picture painted by his Star Academy teacher: "Travis is doing great in the Read Naturally program. He is motivated to improve his words-per-minute by repeatedly practicing passages for both accuracy and speed. Travis is a hard worker and I feel confident with time he should continue to show improvement. I recommend that he continue (continued...)

Similarly, Star Academy test results at the end of the year showed "a continued weakness in basic sight word recognition." Star Year End Report, Exh U, 2216.[5] In the "word attack" subtest of the Woodcock Reading Master Test-NU, TM simply kept pace with but made no gains on grade level. Star Year End Report, Exh U, 2216. In the Slosson Oral Reading Test which "the ability to decode lists of real words [and] provides information about the individual's word recognition ability," TM failed to keep pace with his grade, moving from a starting point of a .6 grade level to a 1.3 grade level despite completion of another year of school. Id.

Star Academy reports also showed that TM did not meet his decoding goals there. See "Multi-sensory Language Program End of the Year Progress Report/Report Card June 2007, Exh. Q, 2207 ("decode[s] a mixed list of nonsense words with 70%+ accuracy four out of five times. [S]cores range from 60%-100% accuracy when reading a list of 10 nonsense words."); compare Exh. C "Annual Goal Form for Privately Funded Student dated 9/19/2006, "Staff Member Slingerland Staff: E. Wood," Exh. C, 2183, ("Goal #1 Decoding ... By 7/06 Travis will decode a list of real + nonsense words (15-20 words) with 90% accuracy. "); 1235:20-1236:21(EW)(TM did not meet either of the goals set for him in his multi-sensory language program).

Star's year end report concludes that while they believed TM made "some gains" – significantly failing to demonstrate "substantial gains" – it finds a "a breakdown when Travis has to read in context." Star Year End Report, Exh U, 2217. Star recommended increasing TM's services at the end of the year, confirming that determining the appropriate level of services is never an exact science. Id.

Thus, the mere fact that failure to maintstream is not an automatic or absolute bar to reimbursement does not help TM here where there has been an abject failure to show his private placements were appropriate for him.

---

[4] (...continued)
to attend Slingerland classes in a one-to-one situation four times weekly." "Multi-sensory Language Program End of the Year Progress Report/Report Card June 2007, Exh. Q, 2207.

[5] This grim report is again contradicted by a relatively rosy teacher report: "Travis has had a productive year in his "Seeing Stars" sessions. He has mastered the first 200 common sight words and he's now doing paragraph reading. ....." "Report Card "Lips/Seeing Stars", dated 6/07, Exh. P, 2206.

### 4. TM IS UNABLE TO ADDRESS ANY OF THE FACTUAL REASONS WHY THE DECISION MUST BE OVERTURNED.

TM identifies no evidence to rebut the many points established by the District. That failure is significant, as the District noted that the underlying Decision's findings against the District either ignore or are otherwise at odds with the evidence in this case.

For example, both TM and the underlying decision fail to address the overwhelming evidence demonstrating that he received substantial benefit from the services offered by the District.

TM and the underlying decision also fail to address the numerous language arts assessments performed in 2004-2005, the reasonable basis for the nature of the specific standardized test assessments performed on TM, or the lack of consequence to perform any additional assessments.[6]

TM and the underlying decision fail to address the overwhelming evidence that the District's decisions regarding the provision of services was reasonable, that TM received extensive and appropriate individualized and small group instruction in the general education environment alone, that there is no magic formula, that this level of services worked well for TM's sister who shared his difficulties, or that the District's decision properly respected the constraints of the least restrictive environment requirement.[7]

---

[6] The Decision makes the unsupportable suggestion that Ms. Dahlstrom's failure at hearing to remember the exact number of sight words TM knew in March of 2005 confirms a need for more assessments. Decision at 1883. That argument bluntly ignores Ms. Dahlstrom's unrebutted testimony that she knew TM's specific sight word abilities at the she wrote his goals. 262:13-18(FD). Perhaps more importantly, the argument ignores the fact that Ms. Dahlstrom was addressing the sight word issue, setting goals for him and assessing his progress. IEP Goals and Objectives, 3/8/05 meeting, 2316; IEP Goals and Objectives, 3/7/06 meeting, 2370(TM recognizes fifty sight words from high frequency list with 90% accuracy). The argument also ignores the fact that the parent's private placement subsequently adopted the same 200 sight word goal set by Ms. Dahlstrom. *See* IEP Goals and Objectives, 3/7/06 meeting, 2370 ("By 3/7/07, [TM] will be able to read the 1st 200 words from a high frequency word list ... "); *compare* 538:6-14(CS)(Star Academy worked on first 200 sight words); "Report Card "Lips/Seeing Stars", dated 6/07, Exh. P, 2206 ("[TM] ... has mastered the first 200 common sight words").

[7] The Decision alludes to the importance of "early intervention" for students but ignores the fact that the evidence demonstrated that the District's efforts beginning in kindergarten comprise such "early intervention." 1589:14-16(SP)(intervention in first through third grades consitutes early
(continued...)

TM and the Decision fail to demonstrate that spelling or writing goals were essential to providing him FAPE and fail to demonstrate any consequence to the absence of such specific goals, particularly in light of the extensive goals set for him, as well as the extensive work in the general education classroom.

TM and the Decision fail to address the evidence overwhelmingly demonstrating that the designation of speech and language services was entirely appropriate.

TM and the Decision do not address the failure to provide that ESY was required or appropriate for him.

### 5. TM'S FAILURE TO IDENTIFY EVIDENCE HE BELIEVES SUPPORTIVE OF THE DECISION REQUIRES GRANTING OF THE DISTRICT'S MOTION.

The record in this matter, as delineated by the District, contains a preponderance of evidence rebutting TM's claims.

If TM had bothered to identify any evidence support of its claims, the District would have been able to identify rebutting evidence.

To the extent TM's failure leads this Court to conduct its own independent review of the record, the District requests that the Court exercise caution as the District will not be in a position to point out significant rebuttal testimony.

An example of the multifacted nature of some of the evidentiary issues, as well as the failure of the Decision to address them is reflected in the Decision's citation to the incredible testimony from Mr. Garabedian that all reading programs must be administered at least forty minutes a day five days a week. Decision at 1885.[8]

---

[7]  (...continued)
intervention); see Individualized Education Program, 5/11/04, 2269-2277(kindergarten IEP); Individualized Education Program, 3/8/05, 2308-2317 (1st grade IEP); Individualized Education Program, 2/7/06-3/7/06, 2355-2373.

[8]  Mr. Garabedian is a professional expert witness, having provided expert opinions in about 50 matters, for which he charges $200 an hour. 692:3-10. He does not have a Ph.D. in any field, but a Bachelor's degree in Sociology from UCLA, and a Masters in School Psychology from San Francisco State University. 675:1-6, ts 29; Garabedian Curriculum Vitae, 2219. He is neither credentialed to
(continued...)

The Decision fails to acknowledge that the testimony is contrary to the consistent evidence, from both the District's and TM's witnesses, that the proper amount of resource specialist time is a process of trial and error, and cannot be based on formula. See District Brief at 16:12-18:13.

The testimony is also surprising, since Mr. Garabedian testified that he has never spoken with TM's teachers or special education providers, was unfamiliar with both the general education accommodations and programs, as well as the special education services, they provided him. 690:24-691:5; 717:5-12; 718:9-14; 746:18-24; 769:25-770:3. His broad testimony regarding curriculum recommendations is thus an empty abstraction. Indeed, Mr. Garabedian has never even met, much

---

[8] (...continued) teach elementary school nor to provide special education services. 718:15-719:2. While Mr. Garabedian professes skills in neuropsychology, he has not received any post-graduate degree in neuropsychology. 682:8-19, ts 76. Instead, he has a "certificate" in neuropsychology from the "Fielding Institute," an adult education facility located in Santa Barbara, California. Id. Mr. Garabedian's specialty appears to be focused on head and brain injuries, disability under the Americans with Disabilities Act and the Rehabilitation Act of 1973, and neuropsychological assessment. 676:19-677:8, ts 30-31 (his professional presentations and training concern issues of head and brain injuries, neuropscyhological evaluations, and disability training for "section 504." (Mr. Garabedian appears to be speaking of section 504 of the Rehabilitation Act of 1973. See Barnes v. Gorman (2002) 536 U.S. 181, 184-185 (§504 of the Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funding, including private organizations, 29 U.S.C. §794(b)(3).")). Mr. Garabedian's employment history is questionable, since he testified that he simultaneously holds two full time jobs, as a public school psychologist (671:8-18, ts 25; 670:1-3 ts 24), and as an educational pyschologist in private practice (670:1-3, ts 24), doing evaluations, training seminars, consulting for the Board of Behavioral Sciences. 670:25-671:7, ts 24-25. For a while, he even held a third job, as an "Adjunct Faculty" member for National University (Garabedian Curriculum Vitae, 2219), a franchise adult education school with over thirty locations around the country, although at hearing, he admitted he was no longer employed by them, having taught there for one year, teaching one two-month course at a time. 1704:8-1705:4. And to top it all off, Mr. Garabedian asserts that he spends a lot of time "keep[ing] up with research in *all* academic areas." 679:25-680:6, ts 33-34 (emphasis added); 763:16-22. Elsewhere, Mr. Garabedian displayed a similar hubris: "I've been involved in several processes. Although, they've all settled, typically, right before I get up to testify. .... It's like they just didn't want me to get in there." 677:24-678:6, ts 31-32. Mr. Garabedian is significantly less qualified than Dr. Claudia Wilson, the District's independent expert, who specializes in special education, with a Ph.D in Special Education from the University of California at Berkeley, teaching positions in the Special Education and English Departments of San Francisco State, substantial community work, and a tendency to work as an advocate on behalf of parents not schools. District Brief at 5:25-6:26, fn. 5; 1412:12-25(CW)(usually works as advocate for parents). Dr. Wilson has extensive experience teaching courses regarding addressing special education students needs, including assessment and curricula. 1417:9-1419:1(CW).

less evaluated, his own client, TM. 665:18-25, ts 59; 690:19-23. These failures are significant since Mr. Garabedian testified that in evaluating a student's disabilities and needs it is important for him to interview the student's teachers and parents, to reviews all educational records, and, in addition to meeting with the student to administer tests to him, conduct an "elaborate" interview of the student himself. 687:24-690:18. Mr. Garabedian's to fulfill the rudiments of his own procedures render his opinions of little weight

The Decision's citation to this testimony is unavailing since it entirely ignores the extensive work occurring in the general education classroom as well as the services provided in resource. *See* District Brief at 13:15-16:10.

The testimony is further untenable since Mr. Garabedian is a school psychologist, with no expertise in curriculum issues. *See* fn. 8, *supra*.

The Decision improperly cites this testimony without even acknowledging, much less addressing the testimony of Dr. Wilson that these recommendations are not reliable. 1369:13-1370:1(adherence to publisher recommendations regarding usage is neither necessary nor appropriate); 1457:5-1458:4("scientific research" regarding recommended schedules is sponsored by publisher, biased, neither juried nor independently analyzed, and does not imply that other approaches are not appropriate). The testimony also implies a cookie cutter approach, which, as Dr. Wilson explained, is exactly contrary to the IDEA requirement of services matched to a student's individual needs. 1369:13- 1370:1. It is significant in this context, that the testimony is inconsistent with the empirical experience of TM's sister who had similar issues to TM and did very well with a twice a week, half hour resource program. *See* District Brief at 17:14-18.

Finally, neither the Decision nor the testimony show any consideration of or respect for the mainstreaming requirements of the IDEA. *See* District Brief at 16:12-18:13.

## CONCLUSION

For the foregoing reasons, the District's Motion for Summary Judgment/Review should be granted, and TM denied any relief on any of his claims. In addition, a motion schedule should be set for determining the amount of attorneys' fees due the District for having to defend itself against the numerous unfounded claims asserted by Real Party.

Dated: February 21, 2008

Respectfully submitted,

RUIZ & SPEROW

By: _____
David E. Lyon
Attorneys for Appellant/Cross-Respondent
San Rafael City Schools